429 S.E.2d 643

**Dennis Dwight SMITH, in his capacity as Administrator, DBN of the Estate of John Q. Hutchinson, deceased, Plaintiff Below,**

v.

**MONONGAHELA POWER COMPANY, Defendant and Third–Party Plaintiff Below, Appellant,**

v.

**DICO COMPANY, INC., a corporation, The Greater Iowa Corporation, a corporation, ASP–Dico, Inc., a corporation, New Dico Company, Inc., a corporation, Dyneer Corporation, a corporation, Dico, Inc., a corporation, Hiab Cranes & Loaders, Inc., a corporation, (collectively referred to as "Dico"), U.S. Truck Cranes, Inc., a corporation, and J.E. White Construction Company, a corporation, Third–Party Defendants Below, Appellees (Dico).**

No. 21345.

Supreme Court of Appeals of West Virginia.

Submitted March 9, 1993.

Decided April 8, 1993.

Harley E. Stollings, Breckinridge, Davis, Sproles & Stollings, Summersville, for appellant.

James A. Colburn, Baer, Colburn & Morris, Huntington, for Dico, appellees.

NEELY, Justice:

Monongahela Power Company ("Monongahela Power") appeals a dismissal of several related corporations, namely: Dico Company, Inc.; The Greater Iowa Corporation; ASP–Dico, Inc.; New Dico Company, Inc.; Dyneer Corporation; Dico, Inc.; and Hiab Cranes & Loaders, Inc. (hereafter referred to collectively as "Dico"). The dismissal order ended Monongahela Power's efforts to seek contribution from Dico in a civil action arising from the death of John Q. Hutchinson.

On 29 March 1985, John Q. Hutchinson delivered mortar, brick and various other masonry supplies to Homer Graham's house. Construction at the Graham house had included the erection of a new bridge across Valley Fork Creek that connected the Graham property with West Virginia Route 36. For approximately 40 years, Monongahela Power had maintained two 7200–volt electric transmission lines directly above the bed of Valley Fork Creek at the location of the newly-erected bridge. After construction of the bridge, the vertical clearance below the lower power line was reduced from 17 feet (above the ground) to 9.1 feet (above the deck of the bridge).

Mr. Hutchinson had apparently been directed to unload the supplies on the bridge, a difficult task due to the physical limitations imposed by the location of Route 36, the bridge, the creek and the power line. Mr. Hutchinson used a boom hoist truck allegedly manufactured by Dico and owned by Mr. Hutchinson's employer, J.E. White Construction Company, to deliver and unload the masonry supplies. During the unloading process, Mr. Hutchinson stood on the ground and manipulated the boom using hand controls, which were connected to the hoist's master control box by an electrical cable. While unloading the supplies, the boom made contact with the power line. The electric current was transmitted through the boom and cable to Mr. Hutchinson, who suffered severe injuries from which he died five weeks later.

The administrator of Mr. Hutchinson's estate, filed suit against Monongahela Power in 1987. The administrator alleged that Monongahela Power had negligently failed to raise two inadequately insulated power lines after being requested to do so by Homer Graham in December 1984, during construction of the bridge. Monongahela Power thereafter filed a third-party complaint for contribution against several third-parties, including Dico. Monongahela Power sought to prove that Dico had manufactured the boom hoist truck and that the design of the hoist controls was the proximate cause of Mr. Hutchinson's injuries. Specifically, Monongahela Power asserted that for several years before the accident, a conversion kit was available that would have replaced the electrical controls with pneumatic controls, thereby eliminating the danger of electric shock. The Hutchinson estate, however, did not sue Dico.

On 16 February 1990, the circuit court ordered that the issues raised in Monongahela Power's third-party complaint be bifurcated for trial purposes from the issues raised in the plaintiff's complaint against

Monongahela Power. The circuit court further ordered that Monongahela Power not be permitted to introduce evidence of negligence by, or seek to assign a percentage of negligence to, the various third-party defendants during the trial between Monongahela Power and the Hutchinson estate. The circuit court determined that, should a jury return a verdict against Monongahela Power and in favor of the estate, Monongahela Power could thereafter proceed to trial against the third-party defendants [1].

On 29 March 1990, the week before trial, Dico entered into a settlement with the Hutchinson estate by which Dico paid the estate $15,000 in exchange for a complete release. Another third-party defendant, U.S. Truck Cranes, Inc., settled with the estate on that same date for $2500.

The trial between the Hutchinson estate and Monongahela Power began on 2 April 1990. The jury were instructed that, should they find that damages were sustained as a result of Monongahela Power's negligence, they must deduct from their verdict the sum of $17,500, the amount paid by "others not sued by the estate...." The jury returned a verdict for compensatory damages in the amount of $789,700 which, upon deduction of the amounts previously paid in settlement [2], left a compensatory damage award of $772,200. The jury attributed 80 percent of the negligence to Monongahela Power and 20 percent to Mr. Hutchinson, further reducing the compensatory judgment against the defendant to $617,760. Additionally, the jury rendered a verdict for $1.5 million in punitive damages against Monongahela Power. On 29 June 1990, the circuit court approved a settlement [3] between the estate and Monongahela Power rendering any appeal of the jury's verdict moot; however, the court reserved Monongahela Power's rights to pursue claims for contribution against others, including Dico.

Dico then moved to dismiss on the grounds that its settlement with the Hutchinson estate insulated it against claims for contribution by Monongahela Power. The circuit court, following a 15 November 1991 hearing, granted Dico's motion on the grounds that the settlement had a factual basis and was in good faith. From this order, Monongahela Power appeals.

### I.

Many of the arguments raised in Monongahela Power's appeal have been resolved in prior decisions of this Court. Monongahela Power asserts that the circuit court erred in determining that the settlement between the Hutchinson estate and Dico ended Monongahela Power's right to seek contribution from Dico, because the estate had never asserted a legal claim against Dico. Our case law clearly indicates, however, that the circuit court's ruling was correct, provided that the settlement between the Hutchinson estate and Dico was, in fact, made in good faith.

In *Board of Education of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 390 S.E.2d 796 (1990), this Court thoroughly examined the doctrine of contribution [4] and the effect of a good faith settlement between a plaintiff and one of multiple joint tortfeasors on the

---

1. Monongahela Power objected to this procedure and sought a writ of prohibition from this Court prohibiting the circuit judge from enforcing the bifurcation order. Monongahela Power's petition was refused by this Court on 7 March 1990.

2. On the final day of trial Mr. Hutchinson's employer, J.E. White Construction Company, also settled with the estate for $1500. The amount of this settlement was not deducted from the compensatory damages assessed by the jury.

3. The amount of this settlement cannot be determined from the record, although Dico asserts

that Monongahela Power settled with the Hutchinson estate for approximately $900,000.

4. "The doctrine of contribution has its roots in equitable principles. The right to contribution arises when persons having a common obligation, either in contract or tort, are sued on that obligation and one party is forced to pay more than his *pro tanto* share of the obligation." Syllabus Point 1, *Zando, supra,* citing Syllabus Point 4, in part, *Sydenstricker v. Unipunch Prods. Inc.,* 169 W.Va. 440, 288 S.E.2d 511 (1982).

rights to contribution of non-settling joint tortfeasors. The Court noted:

A defendant in a civil action has a right in advance of judgment to join a joint tortfeasor based on a cause of action for contribution. This is termed an "inchoate right to contribution" in order to distinguish it from the statutory right of contribution after a joint judgment conferred by *W. Va. Code*, 55–7–13 (1923).

Syllabus Point 2, *Zando, supra*. We noted that most jurisdictions recognizing a right of contribution have decided that a non-settling defendant's right of contribution from a joint tortfeasor is terminated by a settlement between the plaintiff and such tortfeasor before verdict. *Zando*, 182 W.Va. at 605, 390 S.E.2d at 804. Accordingly, the Court concluded: "A party in a civil action who has made a good faith settlement with the plaintiff prior to a judicial determination of liability is relieved from any liability for contribution." Syllabus Point 6, *Zando, supra*.

However, in Syllabus Point 7, *Zando, supra*, we noted:

Defendants in a civil action against whom a verdict is rendered are entitled to have the verdict reduced by the amount of any good faith settlements previously made with the plaintiff by other jointly liable parties. Those defendants against whom the verdict is rendered are jointly and severally liable to the plaintiff for payment of the remainder of the verdict. Where the relative fault of the non-settling defendants has been determined, they may seek contribution among themselves after judgment if forced to pay more than their allocated share of the verdict.

Monongahela Power correctly points out that the plaintiff in *Zando* amended its original complaint to bring a cause of action directly against the settling tortfeasor, who was initially brought into the litigation by the defendant's third-party claim. Thus, the case at bar is factually distinguishable from *Zando* in that the plaintiff estate never filed a claim against the third-party, Dico. However in *Cline v. White*, 183 W.Va. 43, 393 S.E.2d 923 (1990), and *Cook v. Stansell*, 186 W.Va. 189, 411 S.E.2d 844 (1991), decisions rendered after entry of a verdict in the trial between the Hutchinson estate and Monongahela Power, this Court extended the principles of *Zando* to include circumstances where a plaintiff makes a good faith settlement with a non-party before judgment.

In *Cline, supra*, a number of plaintiffs in circuit court who had been exposed to airborne asbestos fibers petitioned this Court to prohibit the Circuit Court of Pleasants County from requiring them to disclose the identity of two or more entities engaged in enterprises in which persons could potentially be exposed to asbestos. The petitioners had entered into settlements with these entities whereby they received payments in exchange for an agreement neither to sue the settling entities nor disclose their identity. Accordingly, the settling entities were never made parties to a suit filed by the petitioners against multiple manufacturers, distributors and installers of asbestos-containing products although the amounts of the settlements were disclosed to permit a reduction in any verdict rendered against the defendants.

In *Cline*, we grappled with the argument that, without disclosure of the identities of the non-parties, it would be difficult to determine whether the plaintiff and the non-parties had entered into a good faith settlement—an important consideration in light of *Zando*'s holding that good faith settlors are relieved from liability for contribution. Syllabus Point 6, *Zando, supra*. Upon considering the principle that good faith settlements relieve parties from liability for contribution, the Court stated:

There is no reason for not applying this same concept to nonparties, for the logic is the same. A settlement entered into between a nonparty and a claimant prior to the instigation of a lawsuit, should discharge the nonparty from further obligation to either the claimant or the nonparty's joint tortfeasor, as long as the settlement was entered into in good faith and the amount of the settlement is disclosed to the trial court for verdict reduction. *See Stambaugh v.*

*Superior Court,* 62 Cal.App.3d 231, 235, 132 Cal.Rptr. 843, 845–46 (1976).

*Cline,* 183 W.Va. at 46, 393 S.E.2d at 926.

The Court again confronted the issue of contribution rights of a defendant against a settling non-party in *Cook, supra.* In *Cook,* the plaintiff was injured when a motorist crashed a vehicle through the front window of a beauty parlor located in a commercial shopping center. The plaintiff entered into a settlement with the motorist and then sued the owners and managers of the shopping mall, alleging negligent design and construction. In answering a question certified by the Circuit Court of Berkeley County, this Court found that the motorist's good faith settlement relieved her from any liability for contribution under the principles set forth in *Zando* and determined that joining the motorist as a third-party defendant would unduly complicate the proceedings at hand and would result in no judgment against the motorist. *Cook,* 186 W.Va. at 191, 411 S.E.2d at 846. The Court concluded:

> When a settlement is entered into between a non-party and a claimant prior to the institution of the suit, a defendant in the suit cannot implead the non-party in a subsequently filed civil action, so long as the settlement was entered into in good faith and the amount of the settlement was disclosed to the trial court for verdict reduction.

Syllabus Point 2, *Cook, supra.*

In both *Cline* and *Cook,* the Court's decisions rested on the conclusion that the principles of *Zando* are not limited to circumstances in which the plaintiff directly asserted a cause of action against the settling tortfeasor. Therefore, we restate the principle set forth in Syllabus Point 3, *Cline, supra.* If a plaintiff enters into a settlement with a non-party against whom it has not directly asserted a cause of action, and the settlement occurs before a judicial determination of liability, the settlement relieves the non-party of all further obligations to the plaintiff and all liability for contribution to the non-party's joint tortfeasor, if the settlement was made in good faith and the amount of the settlement is

disclosed to the trial court for the purpose of reducing the verdict. Accordingly, we find Monongahela Power's right to seek contribution or indemnification from Dico was extinguished by the settlement between the Hutchinson estate and Dico, provided that the settlement was in good faith.

### II.

This Court has not previously addressed, with specificity, the issue of what constitutes a good faith settlement. We have stated that "the chief consideration is whether the settlement arrangement substantially impaired the remaining defendants from receiving a fair trial." *Zando,* 182 W.Va. at 605–06, 390 S.E.2d at 804–05, citing *State ex rel. Vapor Corp. v. Narick,* 173 W.Va. 770, 773, 320 S.E.2d 345, 348 (1984). We agreed that the amount of a good faith settlement need not accurately reflect a jury's ultimate apportionment of liability. *Zando,* 182 W.Va. at 605, 390 S.E.2d at 804. In so doing, we noted *Jachera v. Blake–Lamb Funeral Homes, Inc.,* 189 Ill.App.3d 281, 288, 136 Ill.Dec. 790, 795, 545 N.E.2d 314, 319 (1989), in which the Appellate Court of Illinois pointed out the speculative nature of damages, the uncertainty of liability and the necessity for reliance upon hindsight should a settlement be analyzed in terms of its relationship to a jury verdict. *Zando,* 182 W.Va. at 605, 390 S.E.2d at 804. We expressed some confidence that the good faith test carries inherent safeguards in view of the low probability that a plaintiff will enter into a nominal settlement with a solvent defendant whose liability is significant. *Zando,* 182 W.Va. at 606, 390 S.E.2d at 805. In *Cline, supra,* the Court found that illumination of the issue of what constitutes good faith had been provided by the California Court of Appeal. We quoted that court as follows:

> Except in rare cases of collusion or bad faith, ... a joint tortfeasor should be permitted to negotiate a settlement of an adverse claim according to his own best interests, whether for his financial advantage, or for the purchase of peace and quiet, or otherwise. His good faith will not be determined by the proportion his settlement bears to the damages of

the claimant. For the damages are often speculative, and the probability of legal liability therefor is often uncertain or remote.

*Cline*, 183 W.Va. at 46–7, 393 S.E.2d at 926–27, citing *Stambaugh v. Superior Court*, 62 Cal.App.3d at 238, 132 Cal.Rptr. at 847–48.

Some courts that have addressed this area, such as those in Illinois and California, have benefitted from statutory guidance[5]. Lacking such guidance, this Court has relied in part on the experience of other jurisdictions and uniform statutes[6] proposed by the National Conference of Commissioners on Uniform State Laws in developing the law of this State. In elaborating on the question of what constitutes a good faith settlement, we continue to look elsewhere for guidance but are mindful that our own resolution of the issue must reflect the needs of West Virginia and conform to our own scheme of comparative negligence.

In West Virginia, our law concerning contribution and the termination of contribution rights through settlement is based on two sometimes conflicting goals. Contribution lends a certain equity to situations where a plaintiff has cast the full burden of his injuries on but one of several joint tortfeasors by failing to sue the others. *Zando*, 182 W.Va. at 602–03, 390 S.E.2d at 801–02. However, discharging a settling joint tortfeasor from liability for contribution advances the goal of achieving out-of-court settlements. *Zando*, 182 W.Va. at 604, 390 S.E.2d at 803. The conflict between these two objectives is tempered somewhat by reducing jury verdicts by the amount of partial settlements. *Zando*, 182 W.Va. at 605, 390 S.E.2d at 804.

We have recognized and accepted, however, that this model for verdict reduction does not take into account the settling party's actual degree of fault. *Zando*, 182 W.Va. at 606, 390 S.E.2d at 805. This Court's continued commitment to the concept of joint and several liability[7] must also influence our definition of "good faith settlement."

Two basic approaches have been taken by other courts to define "good faith settlement." In *Lowe v. Norfolk and Western Ry. Co.*, 124 Ill.App.3d 80, 79 Ill.Dec. 238, 463 N.E.2d 792 (1984), the court opined that a settlement should be considered in good faith "when no tortious or wrongful conduct on the part of the settling defendant has been shown." *Lowe*, 124 Ill.App.3d at 94, 79 Ill.Dec. at 249, 463 N.E.2d at 803. The court in *Lowe*, like this Court in *Cline*, relied in part on *Stambaugh v. Superior Court, supra*, where the California Court of Appeal followed a "tortious conduct" approach. *Lowe*, 124 Ill.App.3d at 94, 79 Ill.Dec. at 249, 463 N.E.2d at 803. However, the Supreme Court of California's recent decision in *Tech–Bilt, Inc. v. Woodward–Clyde & Associates*, 38 Cal.3d 488, 213 Cal.Rptr. 256, 698 P.2d 159 (1985), reflects a return to a "reasonable range" or "ratio" test formerly adopted in *River Garden Farms, Inc. v. Superior Court*, 26 Cal.App.3d 986, 103 Cal.Rptr. 498 (1972). The California court's decision in *Tech–Bilt, supra*, was grounded, however, on its interpretation of the legislative intent underlying *California Code of Civil Procedure* § 877.6. The majority in *Tech–Bilt* was sharply criticized in a dissent by Chief Justice Bird, who favored retention of a "tortious conduct" standard. *Tech–Bilt*, 38

5. Specifically, Illinois law has developed around its *Contribution Among Joint Tortfeasors Act*, Ill.Rev.Stat. ch. 70, paras. 301–05 (1987), while California case law has involved interpretation of its *Code of Civil Procedure*, Cal.Civ.Proc.Code §§ 877, 877.6 (1992).

6. Namely, the Uniform Contribution Among Tortfeasors Act, 1955, and the Uniform Comparative Fault Act.

7. As we noted in Syllabus Point 3, *Zando, supra:*
 This jurisdiction is committed to the concept of joint and several liability among joint

tortfeasors. A plaintiff may elect to sue any or all of those responsible for his injuries and collect his damages from whomever is able to pay, irrespective of their percentage of fault. Our adoption of a modified rule for contributory negligence in *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), did not change our adherence to joint and several liability. Syllabus Point 2, *Sitzes v. Anchor Motor Freight, Inc.*, 169 W.Va. 698, 289 S.E.2d 679 (1982).

Cal.3d at 502, 213 Cal.Rptr. at 265, 698 P.2d at 169 (Bird, C.J., dissenting).

The "tortious conduct" approach focuses on the corrupt intent of the settling plaintiff and joint tortfeasor. *Tech–Bilt*, 38 Cal.3d at 502, 213 Cal.Rptr. at 265, 698 P.2d at 169 (Bird, C.J., dissenting). An inquiry in this regard necessarily requires that the party seeking to discredit the settlement present evidence of collusion, fraud, dishonesty or other tortious conduct. Clearly, proof of intent is a difficult if not impossible burden. However, the drafters of the Uniform Contribution Among Tortfeasors Act, 1955, seem to favor the "tortious conduct" approach[8]. The Commissioners clearly placed precedence upon the goal of furthering settlements, rather than equitably apportioning the burdens of liability, commenting: "It seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit." 12 U.L.A. Commissioners' Comments at 100.

The "reasonable range" test adopted in *Tech–Bilt, supra,* requires a trial court "to inquire ... whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries," 38 Cal.3d at 499, 213 Cal.Rptr. at 263, 698 P.2d at 166, and to consider vari-ous other factors[9]. The court in *Tech–Bilt* was of the view that the intent of the California legislature was best carried out by embracing an approach that would serve both the goals of encouraging settlements and equitably allocating the costs among multiple tortfeasors, rather than placing emphasis on only one of these objectives. *Tech–Bilt* 38 Cal.3d at 498–99, 213 Cal.Rptr. at 263, 698 P.2d at 166.

We believe that of the two approaches discussed above, the "tortious conduct" approach best reflects our commitment to the strong public policy favoring out-of-court settlements and best furthers the objectives of finality of judgments and judicial economy. But in view of experiences elsewhere and legal commentary[10], this Court remains concerned that a bald "tortious conduct" approach might pose a burden so great as to impair substantially the right of a non-settling joint tortfeasor to receive a fair trial. Furthermore, we note that several courts purporting to apply the "tortious conduct" test have, in fact, examined numerous factors including the ratio of the settlement to the ultimate verdicts in a case[11]. Therefore, in further developing the definition of "good faith settlement" in West Virginia, we incorporate aspects of both approaches.

■ Initially, we provide the following bright-line rule. Settlements are presump-

---

**8.** "The requirement that the release or covenant be given in good faith gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge." 12 U.L.A. Commissioners' Comments at 99.

**9.** Other factors taken into account included: a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. *Tech–Bilt*, 38 Cal.3d at 499, 213 Cal.Rptr. at 263, 698 P.2d at 166–67 (citations omitted).

**10.** For representative commentary on this area, *see,* Louis J. Perona and Claire Perona Murphy, *Good Faith Settlement Under the Contribution Act: Do Trial Courts Have Too Much Discretion?,* 20 Loy.U.Chi.L.J. 961 (1989).

**11.** For example, in *Lowe,* the Appellate Court of Illinois stated that the "tortious conduct" test was the sounder approach and that the "ratio test" necessarily relies upon hindsight. The court immediately proceeded to find that "the ratio of the settlements in the instant case to the ultimate verdicts does not demonstrate bad faith". *Lowe,* 124 Ill.App.3d at 94–5, 79 Ill.Dec. at 249, 463 N.E.2d at 803. Norfolk and Western Railway Company's arguments that the plaintiff gained a tactical advantage by settling and that the trial court failed to take into consideration the relative culpability of the parties were not persuasive to the court, which determined that "[w]ith no evidence of tortious or wrongful conduct, it does not appear that the settlements were lacking in good faith." *Lowe,* 124 Ill. App.3d at 95–6, 79 Ill.Dec. at 250, 463 N.E.2d at 804.

tively made in good faith. A defendant seeking to establish that a settlement made by a plaintiff and a joint tortfeasor lacks good faith has the burden of doing so by clear and convincing evidence. Because the primary consideration is whether the settlement arrangement substantially impairs the ability of remaining defendants to receive a fair trial, a settlement lacks good faith only upon a showing of corrupt intent by the settling plaintiff and joint tortfeasor, in that the settlement involved collusion, dishonesty, fraud or other tortious conduct.

Some factors that may be relevant to determining whether a settlement lacks good faith are: (1) the amount of the settlement in comparison to the potential liability of the settling tortfeasor *at the time of settlement,* in view of such considerations as (a) a recognition that a tortfeasor should pay less in settlement than after an unfavorable trial verdict, (b) the expense of litigation, (c) the probability that the plaintiff would win at trial, and (d) the insurance limits and solvency of all joint tortfeasors; (2) whether the settlement is supported by consideration [12]; (3) whether the motivation of the settling plaintiff and settling tortfeasor was to single out a non-settling defendant or defendants for wrongful tactical gain [13]; and (4) whether there exists a relationship, such as family ties or an employer-employee relationship, naturally conducive to collusion. *Cf. Tech–Bilt* 38 Cal.3d

at 499, 213 Cal.Rptr. at 263, 698 P.2d at 166–67; Perona and Murphy, *supra* note 10, at 965.

The determination of whether a settlement has been made in good faith rests in the sound discretion of the trial court. The focus of the trial court's determination is not whether the settlement fell within a "reasonable range" of the settling tortfeasor's proportional share of comparative liability, but whether the circumstances indicate that the non-settling tortfeasor was substantially deprived of a fair trial because of corrupt behavior on the part of the plaintiff and the settling tortfeasor or tortfeasors. The determination of the trial court may be based on such evidence as it deems appropriate in the circumstances. In many (if not most) cases, a review of discovery documents and affidavits from counsel will be sufficient. The trial court may, in its discretion, conduct a hearing on the issue, but it is not required to do so [14].

In the present case, the circuit court's dismissal order, prepared by counsel for Monongahela Power and approved by counsel for Dico, found as fact that there was "a factual basis to support the settlement between the Plaintiff and [Dico] ... and further that the payment of Fifteen Thousand Dollars ($15,000.00) based upon settlement negotiations represented

---

**12.** *See, e.g., LeMaster v. Amsted Industries,* 110 Ill.App.3d 729, 66 Ill.Dec. 454, 442 N.E.2d 1367 (1982) (settlement between plaintiff-employee and employer lacked good faith as plaintiff-employee had no rights against employer to relinquish in exchange for the settlement amount, as the Worker's Compensation Act supplied the plaintiff-employee's sole remedy against his employer).

**13.** Under the standards we set forth today, if a defendant attempts to overcome the presumption that a settlement is in good faith by showing that the settlors were motivated by wrongful tactical gain, he pulls an exceptionally heavy oar. Obviously, litigation involves a constant effort to acquire a tactical advantage over an opponent. Where the rushing current of hard-nosed litigation becomes a maelstrom of corrupt intent, we cannot specify in advance, though we note that other courts have, on occasion, found the need to make the distinction in

specific cases. For example, in *Commercial Union Ins. Co. v. Ford Motor Co.,* 640 F.2d 210 (9th Cir.1981), the plaintiff dismissed Ford Motor Company to avoid its expert witnesses and, at trial, won a $3.25 million verdict against a retail dealership. The trial court approved the dismissal, likening the circumstances to a good faith settlement between the plaintiff and Ford Motor Company. The Ninth Circuit reversed, permitting the dealership to pursue equitable indemnification from the manufacturer.

**14.** The question of good faith is a factual one. A trial court must understand the factual details underlying a settlement, and to permit effective appellate review, the details should be placed on the record. If affidavits from counsel and other matters of record present a close case on the good faith issue, the trial court should hold a hearing. *Cf.* Perona and Murphy, *supra* note 10, at 990–97.

to have been occurring prior to the trial in this case is a good faith settlement between the Plaintiff and [Dico]." The order offers no further factual illumination regarding the settlement and the negotiations from which it resulted. Furthermore, the record certified to this Court does not include a transcript of the 15 November 1991 hearing upon Dico's motion to dismiss. The transcripts of the trial and certain other hearings made part of the record are, however, sufficient to indicate that the trial judge must have understood the dynamics of this settlement.

Monongahela Power attacks the settlement in question here by asserting that, because the Hutchinson estate did not sue Dico directly, the settlement must fail for lack of consideration. Monongahela Power notes that the estate accepted the $15,000 settlement from Dico after having demanded an amount fifteen times greater in negotiations with Monongahela Power. Monongahela Power further suggests that the plaintiff may have been motivated by the desire to simplify the issues at trial.

Our review of the record reveals that shortly before trial, Monongahela Power had offered $100,000 in settlement, $50,000 of which Dico had agreed to pay. The plaintiff's final demand for settlement was apparently $200,000–$220,000. It appears that the trial court was persuaded to bifurcate the trial in part because further discovery may have been required concerning the third-party defendants. At an 18 May 1990 post-trial hearing, counsel for the plaintiff indicated that he had felt that the crane may have somehow malfunctioned but had no factual or legal theory on which to base a cause of action against Dico. Earlier, plaintiff's counsel had stated in a 16 February 1990 hearing that he would wait to see what was revealed in discovery before pursuing a direct claim against Dico. Meanwhile, Dico chose to protect its interests by offering the $15,000 in settle-

ment in reliance on this Court's decision in *Zando* entered 22 February 1990.

Dico's $15,000 payment was not a mere windfall or gratuity, as asserted by Monongahela Power. The fact that the plaintiff did not sue Dico directly is of little relevance, as we have held that a non-party may be relieved from liability for contribution through a good faith settlement. The plaintiff's release of its rights to pursue a cause of action directly against Dico was sufficient consideration. The settlors clearly understood that although the plaintiff had not yet formulated a legal theory of recovery against Dico, the plaintiff was clearly aware that it had a tangible claim against Dico.

We see no evidence of fraud or collusion. The plaintiff received no wrongful tactical benefit by settling: the trial court had previously ordered bifurcation of the issues, so the settlement itself in no way simplified the issues in the trial between the plaintiff estate and Monongahela Power. Although Dico may have been able to minimize its liability through settlement, its actions were well within its rights. Finally, we cannot say that the amount of settlement was sufficiently low to indicate corrupt intent in view of the various settlement offers and the probability that the plaintiff would be successful at trial[15].

For all of the aforementioned reasons, the circuit court did not abuse its discretion in determining that the settlement between the Hutchinson estate and Dico was in good faith.

### III.

Finally, Monongahela Power argues that the trial court erred in ordering a bifurcation of the issues raised by the plaintiff's complaint and the issues raised by its third-party complaint. Monongahela Power asserts that it was prejudiced by its inability to present evidence tending to show that the negligence of Dico was a

---

**15.** We note that although the jury apportioned 20 percent of the negligence to the decedent, the potential for a higher share of contributory negligence was not insignificant. It must be noted that the decedent was injured while attempting to unload supplies by hoisting them over a power line that must have been readily visible.

proximate cause of Mr. Hutchinson's injuries [16]. This argument is moot because Monongahela Power entered into a post-judgment settlement with the Hutchinson estate. The current case is not a direct appeal of the jury verdict, but a claim pursuant to rights to contribution. Monongahela Power's attempt to reserve its rights to seek relief from other parties in its settlement agreement with the Hutchinson estate does not overcome the mootness of the claim.

## IV.

For the above-stated reasons, the judgment of the Circuit Court of Clay County is affirmed.

Affirmed.

16. *See Bowman v. Barnes,* 168 W.Va. 111, 124, 282 S.E.2d 613, 621 (1981), where we held that "in order to obtain a proper assessment of the total amount of the plaintiff's contributory negligence under our comparative negligence rule, it must be ascertained in relation to all of the parties whose negligence contributed to the accident, and not merely those defendants involved in the litigation."