505 S.E.2d 640

Sidney HAGER and Sandra Hager, his Wife and Attorney–in–Fact; Joshua C. Parks, an Infant Under the Age of Eighteen Years Who Sues By His Guardian, Father and Next Friend, Ronny L. Parks, and Ronny L. Parks; and Holley Beth Myers, an Infant Under the Age of Eighteen Years Who Sues By Her Guardian, Mother and Next Friend, Cynthia Phillips, and Cynthia Phillips, Plaintiffs Below, Appellees,

v.

James MARSHALL, Defendant Below, Appellee,

v.

The EQUITABLE INSURANCE COMPANY, a Foreign Corporation; Equitable Variable Life Insurance Company (EVLICO), a Subsidiary of the Equitable; Equico Securities, Inc., a Subsidiary of the Equitable Insurance Company; and Joe V. Funderburk, Third–Party Plaintiffs Below, Appellants,

v.

PACIFIC FIDELITY INSURANCE COMPANY, General Services Life Insurance Company, Kennesaw Life & Accident Insurance Company, Old Colony Life Insurance Company, Anchor Brokerage Centre, Inc., Aegon USA, Bankers United Life Assurance Company, and Aetna Life Insurance and Annuity Company, Third–Party Defendants Below, Appellees.

No. 24746.

Supreme Court of Appeals of West Virginia.

Submitted May 13, 1998.

Decided June 18, 1998.

Martin J. Glasser, John A.W. Lohmann, Lewis, Friedberg, Glasser, Casey & Rollins, Charleston, Carl S. Kravitz, Caplin & Drysdale, Washington, D.C., for Hager, et al.

John M. Slack, III, Mychal S. Schulz, Jackson & Kelly, Charleston, for Equitable, EVLICO & Funderburk.

Tammy R. Harvey, Robert P. Martin, Bastien & Martin, Charleston, for Pacific Fidelity, General Services Life, Aegon & Bankers United.

Thomas V. Flaherty, Christopher W. Jones, Flaherty, Sensabaugh & Bonasso, Charleston, for Anchor Brokerage Centre, Inc.

MAYNARD, Justice:

This case is before this Court upon appeal of two orders of the Circuit Court of Boone County entered upon April 15, 1997, and April 17, 1997. The appellants, The Equitable Insurance Company, Equitable Variable Life Insurance Company, Equico Securities, Inc., and Joe V. Funderburk [hereinafter "Equitable"] contend that the circuit court erred in finding that a settlement between the plaintiffs below and the third-party defendants, Pacific Fidelity Life Insurance [hereinafter "Pacific Fidelity"], General Services Life Insurance Company [hereinafter "General Services"], Bankers United Life Assurance Company [hereinafter "Bankers United"], and Aegon USA [hereinafter Aegon] was in good faith. Equitable also contends that the circuit court erred in dismissing its claims for implied indemnity because of the settlement. Equitable further asserts that the circuit court erred in granting summary judgment to third-party defendant Anchor Brokerage Centre, Inc. [hereinafter "Anchor Brokerage"].

This Court has before it the petition for appeal, the designated record, and the briefs and argument of counsel. For the reasons set forth below, we affirm the orders of the circuit court.

I

In July 1994, Sidney and Sandra Hager, Ronny L. Parks, individually, and on behalf of Joshua C. Parks, and Cynthia Phillips, individually, and on behalf of Holley Beth Myers [hereinafter "plaintiffs"], filed suit against Equitable and James Marshall. The complaint alleged that Mr. Marshall had sold annuities to the plaintiffs, all of whom had received large personal injury settlements. The complaint further alleged that Mr. Marshall began to steal money from some of the annuities and to "twist or churn" other annuities to his benefit.[1] As a result, the plaintiffs claimed that they suffered losses in excess of $642,000.00.

The plaintiffs maintained that Mr. Marshall presented himself as an agent of Equitable with actual and apparent authority and

---

1. "Churning" occurs when a broker exercises control over the volume and frequency of trades initiating transactions that are excessive in view of the customers objectives for personal gain. *Black's Law Dictionary* 242 (6th ed.1990).

"Twisting" involves misrepresenting or misstating facts to induce an insured to give up a policy in one company for the purpose of taking insurance in another company. *Id.* at 1519.

represented that he was selling them Equitable products. His office, as well as his stationary and business cards, bore Equitable's name. Therefore, plaintiffs asserted that Equitable was liable for the losses caused by Mr. Marshall's fraudulent conduct.[2]

In response to the complaint, Equitable asserted that Mr. Marshall diverted business from Equitable while acting as the agent of Pacific Fidelity and General Services. While a contract existed between Mr. Marshall and Equitable providing that he was an agent of Equitable, Mr. Marshall was also apparently an agent for twenty-six different companies. Of the nine fraudulent annuity transactions in this case, seven of the annuities Mr. Marshall sold to the plaintiffs were products of Pacific Fidelity and General Services. Equitable claimed that it had no knowledge of the various sales and transactions regarding the other companies' products. Accordingly, in June 1996, Equitable filed a third-party complaint against Pacific Fidelity, General Services, Bankers United, Aegon, and Anchor Brokerage[3] alleging that Mr. Marshall was an agent of the third-party defendants and that they knew or should have known of his wrongful and/or negligent acts.

On November 27, 1996, the plaintiffs entered into a settlement with Pacific Fidelity, General Services, Bankers United, and Aegon in the amount $27,500.00. In exchange, the plaintiffs agreed to release the settling third-party defendants from any and all claims the plaintiffs had or may have had resulting from and relating to the allegations set forth in the complaint. Thereafter, Equitable contested the settlement on the grounds that it was not made in good faith.

On April 15, 1997, the circuit court entered an order finding that the settlement was in good faith. The circuit court also dismissed Equitable's claims for contribution and implied indemnity against the settling third-party defendants because of the settlement. At the same time, the circuit court considered a motion for summary judgment filed by Anchor Brokerage, the other third-party defendant. Anchor Brokerage claimed that it merely performed a clerical role in facilitating certain transactions between Mr. Marshall and some of the companies. Equitable asserted Mr. Marshall was actually an agent of Anchor Brokerage, and therefore, it was liable to the plaintiffs and/or the third-party plaintiffs for its negligence, breach of duties, and/or wrongful conduct. By order entered on April 17, 1997, the circuit court granted summary judgment in favor of Anchorage Brokerage and dismissed it from the suit.

Subsequently, the plaintiffs settled their claims with Equitable for $2,000,000.00. The third-party defendants declined to contribute toward the settlement. This appeal followed.

II

■ As its first assignment of error, Equitable contends that the circuit court erred in finding that the settlement agreement reached between the plaintiffs and the settling third-party defendants was in good faith. When we review challenges to the findings and conclusions of a trial court, we apply a two-prong standard of review. The final order and the ultimate disposition are reviewed under an abuse of discretion standard while the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a de novo review. *Phillips v. Fox*, 193 W.Va. 657, 661, 458 S.E.2d 327, 331

---

2. Instead of selling Equitable products, Mr. Marshall actually sold the plaintiffs Pacific Fidelity and General Services annuities. In April 1991, Mr. Marshall "churned" all Pacific Fidelity and General Services annuities into annuities issued by Kennesaw Life & Accident Insurance Company and Old Colony Life Insurance Company. In 1992, Old Colony went into receivership. It has since been rehabilitated with losses to the annuity owners.

In addition to his "churning" activities, Mr. Marshall diverted funds to himself from some of the annuities which had check-writing features. As a result of his embezzlement scheme, Mr. Marshall was convicted and sentenced to a federal prison term.

3. Prior to 1991, Aegon owned sixty percent of General Services and their products were marketed under the names of General Services and Pacific Fidelity. In 1991, Aegon purchased the remainder of General Services and began marketing its products under the names of Bankers United and Pacific Fidelity. Anchor Brokerage, a brokerage clearing house, had a contractual relationship with General Services, Pacific Fidelity, Bankers United and Aegon.

(1995). *See* also Syllabus Point 1, *Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995).

■ With regard to whether a settlement was made in good faith, we have specifically held that:

> The determination of whether a settlement has been made in good faith rests in the sound discretion of the trial court. The focus of the trial court's determination is not whether the settlement fell within a "reasonable range" of the settling tortfeasor's proportional share of comparative liability, but whether the circumstances indicate that the non-settling tortfeasor was substantially deprived of a fair trial because of corrupt behavior on the part of the plaintiff and the settling tortfeasor or tortfeasors. The determination of the trial court may be based on such evidence as its deems appropriate in the circumstances. In many (if not most) cases, a review of discovery documents and affidavits from counsel will be sufficient. The trial court may, in its discretion, conduct a hearing on the issue, but it is not required to do so.

Syllabus Point 7 of *Smith v. Monongahela Power Co.,* 189 W.Va. 237, 429 S.E.2d 643 (1993).

■ In *Smith,* we developed the definition of a "good faith settlement" in West Virginia. In Syllabus Point 5, we stated:

> Settlements are presumptively made in good faith. A defendant seeking to establish that a settlement made by a plaintiff and a joint tortfeasor lacks good faith has the burden of doing so by clear and convincing evidence. Because the primary consideration is whether the settlement arrangement substantially impairs the ability of remaining defendants to receive a fair trial, a settlement lacks good faith only upon a showing of corrupt intent by the settling plaintiff and joint tortfeasor, in that the settlement involved collusion, dishonesty, fraud or other tortious conduct.

■ With this standard in mind, we then set forth several factors for the trial court to consider when making the determination of whether a settlement was in good faith. In Syllabus Point 6 of *Smith,* we provided:

> Some factors that may be relevant to determining whether a settlement lacks good faith are: (1) the amount of the settlement in comparison to the potential liability of the settling tortfeasor *at the time of settlement,* in view of such considerations as (a) a recognition that a tortfeasor should pay less in settlement than after an unfavorable trial verdict, (b) the expense of litigation, (c) the probability that the plaintiff would win at trial, and (d) the insurance limits and solvency of all joint tortfeasors; (2) whether the settlement is supported b consideration; (3) whether the motivation of the settling plaintiff and settling tortfeasor was to single out a non-settling defendant or defendants for wrongful tactical gain; and (4) whether there exists a relationship, such as family ties or an employer-employee relationship, naturally conducive to collusion.

■ Equitable asserts that an examination of the facts and circumstances of this case in light of the guidelines enunciated in *Smith* demonstrates that the settlement between the plaintiffs and settling third-party defendants was not made in good faith. Specifically, Equitable points to the fact that the settlement amount was only $27,500.00 even though the plaintiffs' own economic experts had calculated the damages to be in excess of $642,000.00. Equitable argues that the relationship between the plaintiffs and the settling third-party defendants was "naturally conducive to collusion" because without the third-party defendants in the case, it would be easier for the plaintiffs to prove their claims against Equitable.

*Smith* was a wrongful death action in which the decedent was electrocuted when the crane he was operating came into contact with high voltage electric lines. The administrator of the decedent's estate sued the electric company, Monongahela Power, which in turn sued the manufacturer of the crane, Dico Company. 189 W.Va. at 240, 429 S.E.2d at 646. Prior to trial, the decedent's estate settled with Dico for $15,000.00, after demanding an amount fifteen times greater from Monongahela Power. 189 W.Va. at 241, 429 S.E.2d at 647. Like Equitable, Monongahela Power asserted that the settlement

was not in good faith because the plaintiff was motivated by the desire to simplify the issues at trial. In addition, Monongahela Power argued that the settlement agreement had to fail for lack of consideration because the plaintiff never sued Dico directly. *Id.*

In finding that the settlement in *Smith* was in good faith, we noted that the fact that the plaintiff never sued Dico directly was of little relevance because of our previous holding that a non-party may be relieved from liability for contribution through a good faith settlement. *See* Syllabus Point 3, *Cline v. White,* 183 W.Va. 43, 393 S.E.2d 923 (1990). We also found that the plaintiff's agreement to release its right to pursue a cause of action directly against Dico was sufficient consideration because the settlors were clearly aware that they had a tangible claim against Dico. Finally, we determined that the amount of the settlement was not sufficiently low to indicate a corrupt intent considering the various settlement offers and probability that the plaintiff would be successful at trial. 189 W.Va. at 247, 429 S.E.2d at 653.

After reviewing the record in the case *sub judice,* we reach similar conclusions. Despite Equitable's urging that the amount of the settlement is indicative of collusion, dishonesty and fraud, it has not offered any evidence to substantiate this claim. During the hearing before the circuit court on this issue, Equitable merely argued that the majority of losses were caused by Mr. Marshall while he was acting as the actual agent for the settling third-party defendants. Equitable never presented any evidence suggesting that the settlement was achieved with corrupt intent.

█ On the other hand, the third-party defendants contend that the anticipated cost of litigation was the motivating factor in the settlement. As we noted in *Smith,* third-party defendants' decisions to limit their liability through settlement is well within their rights. *Id.* In this case, we have found no evidence to show that the amount of the settlement was not fair, reasonable, or within the range of reason given the evidence and proffers of evidence adduced at the hearing before the circuit court. Therefore, the circuit court did not abuse its discretion by finding that the settlement between the plaintiffs and third-party defendants was in good faith.

## III

█ Equitable next contends that the circuit court erred in ruling that it could not pursue its claims for implied indemnity against the settling third-party defendants because of the good faith settlement. As we noted above, a good faith settlement extinguishes a claim for contribution against the settling party. In Syllabus Point 6 of *Board of Educ. of McDowell County v. Zando, Martin & Milstead,* 182 W.Va. 597, 390 S.E.2d 796 (1990), we held: "A party in a civil action who has made a good faith settlement with the plaintiff prior to a judicial determination of liability is relieved from any liability for contribution." However, in Syllabus Point 6, of *Dunn v. Kanawha County Bd. of Educ.,* 194 W.Va. 40, 459 S.E.2d 151 (1995), we held:

> In a multiparty product liability lawsuit, a good faith settlement between the plaintiff(s) and the manufacturing defendant who is responsible for the defective product will not extinguish the right of a non-settling defendant to seek implied indemnification when the liability of the non-settling defendant is predicated not on its own independent fault or negligence, but on a theory of strict liability.

Thus, Equitable contends that it may pursue its implied indemnity claim against the settling third-party defendants, notwithstanding their good faith settlement with the plaintiffs, because its liability was premised on the vicarious liability theory of apparent authority.

*Dunn* was a certified question case arising out of a multiparty products liability suit in which several plaintiffs alleged injuries as the result of exposure to toxic substances, including a termicide known as chlordane, at Andrew Jackson Junior High School. 194 W.Va. at 43, 459 S.E.2d at 154. The plaintiffs, parents, students, teachers, and others, reached a settlement with Velsicol, the chlordane manufacturer, whereby in exchange for a substantial monetary settlement, they agreed to dismiss all claims against Velsicol.

Thereafter, the non-settling defendants in the chain of distribution wanted to be able to seek indemnification from Velsicol if they were subsequently made to pay damages to the plaintiffs for the injuries they asserted Velsicol was solely responsible for as the manufacturer of the defective product. Velsicol contended that all potential claims against it, including claims for implied indemnity, were extinguished because of the settlement. *Id.* As a result of this dispute, the circuit court certified the following question: "Whether a good faith settlement by a defendant extinguishes rights of non-settling defendants and others for implied indemnity against the settling defendant under West Virginia law?" 194 W.Va. at 44, 459 S.E.2d at 155.

We answered the certified question in the negative emphasizing that the right to seek implied indemnity belongs only to a person who is without fault. We explained:

> 'The general principle of implied indemnity arises from equitable considerations. At the heart of the doctrine is the premise that the person seeking to assert implied indemnity-the indemnitee-has been required to pay damages caused by a third party-the indemnitor. In the typical case, the indemnitee is made liable to the injured party because of some positive duty created by statute or the common law, but the actual cause of the injury was the act of the indemnitor.' Syllabus Point 2, *Hill v. Joseph T. Ryerson & Son, Inc.,* 165 W.Va. 22, 268 S.E.2d 296 (1980).

194 W.Va. at 44, 459 S.E.2d at 155 (quoting Syllabus Point 1, *Sydenstricker v. Unipunch Products, Inc.,* 169 W.Va. 440, 288 S.E.2d 511 (1982)).

In the case *sub judice,* Equitable is unable to claim that it is without fault.[4] Nonetheless, Equitable maintains that it may still pursue its implied indemnity claim. In making this assertion, Equitable relies heavily upon the following language from *Dunn:* "[T]he rules of both contribution and indemnity could apply where a seller does not contribute to a defect in the product, but

commits an independent act of negligence or is at fault in some other manner." 194 W.Va. at 47, 459 S.E.2d at 158. Based upon this language, Equitable concludes that it can pursue its implied indemnity claims even if the plaintiffs pursued another theory of liability that alleged fault on the part of Equitable. We disagree.

While we may have suggested in *Dunn* that the rules of contribution and indemnity might apply in certain strict liability situations where independent acts of negligence were involved, those circumstances do not exist in this case. The individual financial dealings herein represent distinct and independent transactions and do not share a relationship in the stream of commerce as contemplated by *Dunn.* Consequently, the referenced language from *Dunn* offers no support for Equitable's implied indemnity claim.

 As we explained above, the certified question in *Dunn* was answered with the understanding that "[i]mplied indemnity is based upon principles of equity and restitution and one must be without fault to obtain implied indemnity." Syllabus Point 2, *Sydenstricker v. Unipunch Products, Inc.,* 169 W.Va. 440, 288 S.E.2d 511 (1982). Obviously, that concept is equally instructive outside of the products liability context. Accordingly, we hold that in non-product liability multiparty civil actions, a good faith settlement between a plaintiff and a defendant will extinguish the right of a non-settling defendant to seek implied indemnity unless such non-settling defendant is without fault. Based upon the evidence in the record, specifically Equitable's own admissions, Equitable is not without fault for the plaintiffs' losses. Therefore, the circuit court did not err in dismissing Equitable's claim for implied indemnification.

### IV

We now consider Equitable's last assignment of error which concerns the circuit court's order of April 17, 1997, granting

---

4. Equitable forcefully argued in its brief submitted to the circuit court opposing the settlement that it was five percent responsible and that the

settling third-party defendants were ninety-five percent responsible

summary judgment in favor of Anchor Brokerage, the other third-party defendant. Equitable contends that a genuine issue of material fact exists as to the role that Anchor Brokerage played in training and supervising Mr. Marshall.

Pursuant to Rule 56 of the *West Virginia Rules of Civil Procedure*, summary judgment is required when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In Syllabus Point 3 of *Aetna Casualty & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963), this Court held: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *See also* Syllabus Point 3, *Evans v. Mutual Mining*, 199 W.Va. 526, 485 S.E.2d 695 (1997); Syllabus Point 1, *McClung Investments, Inc. v. Green Valley Community Pub. Serv. Dist.*, 199 W.Va. 490, 485 S.E.2d 434 (1997). More recently, we have observed that:

> Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syllabus Point 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). See also Syllabus Point 2, *Cottrill v. Ranson*, 200 W.Va. 691, 490 S.E.2d 778 (1997); Syllabus Point 2, *McGraw v. St. Joseph's Hosp.*, 200 W.Va. 114, 488 S.E.2d 389 (1997).

In Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) we stated that: "A circuit court's entry of summary judgment is reviewed *de novo.*" *See also* Syllabus Point 4, *Dieter Eng'g Services, Inc. v. Parkland Dev., Inc.*, 199 W.Va. 48, 483 S.E.2d 48 (1996); Syllabus Point. 1, *Smith v. Stacy*, 198 W.Va. 498, 482 S.E.2d 115 (1996).

Equitable sought contribution from Anchor Brokerage based on the allegation that Mr. Marshall was also an agent for Anchor Brokerage as well as the other third-party defendants. Anchor Brokerage maintained that it owed no duty to the plaintiffs as it only had a contractual relationship with the other third-party defendants whereby it simply reviewed paperwork submitted by Mr. Marshall for completeness. The record indicates that during discovery, Equitable admitted the following: (1) at no relevant time was Anchor Brokerage a party to an express contract with the plaintiffs; (2) at no relevant time did Anchor Brokerage owe express contractual duties to the plaintiffs; (3) Mr. Marshall was not Anchor Brokerage's actual or apparent agent; and (4) there was no express contract between Anchor Brokerage and Mr. Marshall. In addition, Equitable admitted that Anchor Brokerage never altered any documents that it processed and in fact, never communicated with the plaintiffs. Moreover, in response to interrogatories propounded by Anchor Brokerage, Equitable in effect was unable to identify any statute, code section, or rule of law that Anchor Brokerage, by act or omission, allegedly violated with respect to the plaintiffs.

Despite these admissions, Equitable now contends that summary judgment was improper because the deposition testimony of Dave Cave, former Vice President of Marketing for Bankers United, Pacific Fidelity, and General Services, and Norman Allen, senior counsel for Bankers United and General Services, indicates that Anchor Brokerage in fact was the entity responsible for the training and supervising of Mr. Marshall in his solicitation and sales of the Pacific Fidelity, Bankers United, and General Services policies. As noted above, the circuit court held a hearing on Anchor Brokerage's motion for summary judgment on April 15, 1997, one month after the discovery deadline. At that time, neither Mr. Cave nor Mr. Allen had been deposed. Their depositions were not taken until May 2, 1997, and June 23, 1997, respectively, after the circuit court had granted summary judgment in favor of Anchor Brokerage. Although Equitable asserts that the other third-party defendants fatally impeded their ability to conduct discovery,

there is no evidence in the record indicating that they sought an extension of the discovery deadline.[5] In fact, Equitable has presented no substantive justification for this Court to consider the deposition testimony of Mr. Cave and Mr. Allen. Nonetheless, we find nothing in the testimony of Mr. Cave or Mr. Allen that raises a genuine issue of material fact in this case.

■ Based upon our review of the record, we find that Anchor Brokerage has met its burden of proving that there is no material issue of fact and that it was entitled to judgment as a matter of law. Equitable failed to produce any evidence showing the existence or breach of any duty owed by Anchor Brokerage to the plaintiffs. In *Zando*, we explained that the touchstone of the right of inchoate contribution[6] is that the party against whom contribution is sought breached a duty to the plaintiff which caused or contributed to the plaintiff's damages. 182 W.Va. at 603, 390 S.E.2d at 802. It is undisputed that Anchor Brokerage had a written contract with the other third-party defendants. However, Equitable failed to present any documentary evidence or testimony to show that the contract created a duty owed to the plaintiffs. Therefore, the circuit court's order granting summary judgment in favor of Anchor Brokerage was proper.

Accordingly, for the reasons set forth above, the final orders of the Circuit Court of Boone County dated April 15, 1997, and April 17, 1997, are affirmed.

Affirmed.

---

**5.** We do note that Equitable did attempt to hold Anchor Brokerage's summary judgement motion in abeyance, but that request was denied by the circuit court.

**6.** Inchoate contribution is the right in advance of judgment to join a joint tortfeasor based on a cause of action for contribution. *See* Syllabus Point 2, *Zando*.