**DACOTAH MARKETING AND RESEARCH, L.L.C.,**
Plaintiff,

v.

**VERSATILITY, INC., Defendant.**

**VERSATILITY, INC., Third–Party Plaintiff,**

v.

**SALES & MARKETING COMMUNICATIONS CONSULTANTS, INC.,**

and

**Thomas D. Phillips, Third–Party Defendants.**

No. 98–142–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 30, 1998.

Steven G. Storch, Russell D. Munves, Storch Amini & Munves, P.C., New York, NY, for Plaintiff and Third Party Defendants.

Thomas R. Folk, Steven T. Webster, Falls Church, VA, for Defendant and Third Party Plaintiff.

## MEMORANDUM OPINION

ELLIS, District Judge.

This diversity fraud and misrepresentation action presents an unsettled question of Virginia law concerning the nature of the "good faith" required of a claimant in settling with one of two or more joint tortfeasors pursuant to Virginia Code § 8.01–35.1. Also presented are more prosaic questions concerning collateral estoppel and whether indemnity may be implied in the face of a written agreement between the parties.

### I.[1]

Plaintiff Dacotah Marketing & Research (Dacotah) is a limited liability company organized under North Dakota law, with its principal place of business in Minot, North Dakota. As part of its business, Dacotah provides its customers with a variety of telephone call center services, including answering customer calls, taking product orders and disseminating product information. Defendant Versatility, Inc., is a Delaware corporation with its headquarters in Fairfax County, Virginia. Versatility produces specialized computer

---

1. Although many facts are hotly disputed, the facts necessary for resolution of the issues at bar are essentially undisputed.

software that it promotes as suitable for use in connection with telephone call centers.

Third-party defendant Sales & Marketing Communications Consultants (S & MC2) is a Virginia corporation with its principal place of business in Virginia. Pursuant to a written agreement, S & MC2 was a value-added reseller for Versatility, *i.e.,* an independent contractor that purchased and then resold Versatility software, as well as software and hardware from other producers. In conjunction with its sales of these products, S & MC2 also sold services, such as systems integration. Third-party defendant Thomas D. Phillips is a principal of S & MC2.

In February, 1996, Dacotah entered into negotiations with S & MC2, represented by Phillips, for the sale and installation of a computer software system. S & MC2 recommended a system to Dacotah that was ostensibly designed to meet Dacotah's rapidly expanding needs. Included as part of this recommended system was Versatility's call center software. S & MC2 represented to Dacotah that the Versatility software had "multiple campaign capability," also known as "campaign switching," a feature that allowed multiple telephone operators to access simultaneously, via a computer network, the same and/or multiple sales dialogs. Moreover, S & MC2 provided Dacotah with a January, 1996, Versatility "White Paper" that described the technological capabilities and characteristics of the Versatility call center software. Specifically, the "White Paper" provided that "the call center/telephony server can handle hundreds of concurrent agents and multiple campaigns." In addition, in May, 1996, prior to Dacotah's purchase of the system that included the Versatility software, Dacotah sent a representative, John Grilley, to Versatility's Virginia offices for training on the Versatility software. There, the Versatility trainer advised Grilley that the production version of the Versatility software would allow an agent to log on to more than one campaign at a time, *i.e.,* "multiple campaign capability."

Based on the representations made by S & MC2 and Versatility, Dacotah entered into a written call center automation agreement with S & MC2 to purchase computer hardware and software, including the Versatility call center software and software maintenance. Yet, shortly thereafter Dacotah learned that the Versatility software did not have the "multiple campaign capability" as represented. This discovery precipitated not only the instant action, but also a dispute between Versatility and S & MC2.

The latter dispute matured first. In June, 1996, Versatility terminated its value-added reseller agreement with S & MC2, alleging that S & MC2 had negligently or knowingly misrepresented the capabilities of the Versatility software to Dacotah and others. S & MC2 denied these allegations, arguing instead that it had merely relied on Versatility's representations concerning its call center software, representations that appeared in a Versatility publication. In connection with this dispute, S & MC2 retained the law firm of Storch Amini & Munves (the Munves firm) and thereafter made a demand for arbitration against Versatility. This demand covered S & MC2's claims against Versatility for breach of contract, breach of warranty, tortious interference with contract, and fraud. Versatility counterclaimed, and the matter proceeded to arbitration with S & MC2 represented by the Munves firm. After eight days of hearings, three arbitrators unanimously awarded S & MC2 $267,000 in damages. As often occurs in arbitrations, the award was not accompanied by an opinion or statement of reasons and did not otherwise provide any findings of fact or conclusions of law.

Dacotah elected to await the outcome of the *S & MC2 v. Versatility* arbitration before initiating the instant action. Following the conclusion of the arbitration, Dacotah retained the Munves firm and on February 2, 1998, filed the instant action against Versatility. Versatility answered, denying liability and asserting various defenses. It also filed a third-party complaint against S & MC2 and Phillips for indemnification and contribution.

At this point, the Munves firm found itself on both ends of this action: it represented plaintiff, Dacotah, and it also represented the third-party defendants, S & MC2 and Phillips, as it had in the earlier arbitration pro-

ceeding. In the circumstances, Dacotah, on the advice of its outside North Dakota counsel, decided "to eliminate any potential conflict" by giving S & MC2 and Phillips a release from any liability to Dacotah, in return for one dollar. Dacotah gave three reasons for its decision to issue the release for only one dollar. First, Dacotah wanted to continue to receive the benefit of the Munves firm's representation, as that firm had demonstrated competence and thorough familiarity with the facts in representing S & MC2 in the arbitration victory against Versatility.[2] Second, the arbitration result led Dacotah to believe that there was little likelihood that it could prevail in any suit against S & MC2 and Phillips. And finally, Dacotah believed that neither S & MC2 nor Phillips had assets sufficient to respond to the magnitude of the judgment Dacotah expected to win in this case.

This matter is now before the Court on the third-party defendants' motion for summary judgment on the third-party complaint. Three principal arguments are advanced in support of this motion. First, S & MC2 and Phillips argue that the release received from Dacotah is effective under Virginia Code § 8.01–35.1[3] to bar any claim against them by Versatility. Next, S & MC2 and Phillips contend that the contractual relations between them and Versatility admit of no basis for an express or implied indemnity claim. And finally, S & MC2 and Phillips argue that the arbitration result collaterally estops Versatility from suing them because that result necessarily included a finding that Versatility fraudulently misrepresented the capabilities of its software and that S & MC2 and Phillips reasonably relied on these representations.

**2.** Also important to Dacotah was the Munves firm's willingness to undertake the representation on a contingency basis.

**3.** Section 8.01–35.1 provides in pertinent part that:
 A. When a release or a covenant not to sue is given in good faith to one of two or more persons liable in tort for the same injury, or the same property damage or the same wrongful death:
  1. It shall not discharge any of the other tort-feasors from liability for the injury, property damage or wrongful death unless

Each of these arguments is separately addressed following a brief statement of the appropriate summary judgment standard.

## II.

Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard is met where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "mere scintilla" of evidence, however, is not enough. To the contrary, when viewed in the light most favorable to the non-moving party, the evidence must be sufficient for a reasonable jury to find in favor of that party, given the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 ·U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

Analysis properly begins with the question whether the release Dacotah gave S & MC2 meets § 8.01–35.1's "good faith" requirement, for the answer to this question may have dispositive consequences. If the release is found to fit within § 8.01–35.1 because it was given in "good faith," then by the terms of that statute, the release is effective to release only S & MC2[4] and therefore Versatility's third-party contribution claim against S & MC2 must be dismissed. Equally significant consequences may flow from a conclusion that the release was not given in

 its terms so provide; but any amount recovered against the other tort-feasor or any one of them shall be reduced by any amount stipulated by the covenant or the release, or in the amount of the consideration paid for it, whichever is the greater...
 2. It shall discharge the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor.

**4.** In general, throughout this discussion, references to S & MC2 include third-party defendant Phillips.

"good faith." In that event, the effect of the release may be governed not by § 8.01–35.1, but by Virginia's common law rule that a release of one tortfeasor releases all, which in the circumstances would require dismissal of the main claim, *i.e.*, Dacotah's claim against Versatility. *See Jones v. General Motors Corp.*, 856 F.2d 22, 24 (4th Cir.1988) ("Releases which do not satisfy the requirements of ... [§ 8.01–35.1] have the effect, according to the common law, of releasing all joint tort-feasors."). Alternatively, if the release was given in bad faith, it may simply be void, without effect for any party in the action.[5] This would leave opposing parties, Dacotah and S & MC2, in the position of being represented by the same law firm, a situation that would require disqualification of that law firm from representing at least one, if not both, of its current clients.

The requirements of "good faith" under § 8.01–35.1 are not immediately apparent for the phrase in this context is not defined in the statute or elucidated in decisions of the Supreme Court of Virginia.[6] Yet, there are decisive clues. First, § 8.01–35.1 derives from § 4 of the Uniform Contribution Among Tortfeasors Act (UCATA),[7] and hence the interpretation of § 4 in the states that have

adopted it is instructive.[8] Second, § 8.01–35.1 is, of course, not the only reference to "good faith" in Virginia law, and the definition of "good faith" elsewhere in Virginia law may also be instructive. Finally, the structure of § 8.01–35.1 itself provides some guidance as to the meaning of "good faith" in this context.

■ Two policy goals underlie the UCATA and guide its interpretation, and hence, the interpretation of § 8.01–35.1. First, the overarching purpose of § 4 of the UCATA is to foster settlements in the multiple tortfeasor context.[9] The common law rule often impeded settlements in this situation by making the price of settling with one tortfeasor, the release of all tortfeasors. The UCATA removed this impediment by allowing a claimant to settle with one or fewer than all tortfeasors without giving up claims against the remaining tortfeasors. Yet, this settlement option is limited by the "good faith" requirement. This requirement reflects UCATA's significant ancillary goal of preventing collusion and thereby reasonably ensuring a fair distribution of responsibility for a plaintiff's damages among all tortfeasors.[10]

---

**5.** *See* Rigsby, *The Covenant Not to Sue: Virginia's Effort to Bury the Common Law Rule Regarding the Release of Tortfeasors*, 14 U. Rich. L.Rev. 809, 824 (1980) ("[I]f the settling tortfeasor has acted in bad faith, the court, upon motion by either the plaintiff or the nonparticipant, will declare the instrument void and allow the plaintiff to bring suit against any or all tortfeasors.")

**6.** Virginia law governs in this diversity suit. More precisely, it is Virginia's choice of law rules that govern. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In this instance, the parties correctly agree that Virginia substantive law governs the effect of the release, a conclusion that finds firm support in the release itself, which is captioned "Release Pursuant to Va.Code § 8.01–35.1" and which was executed in counterparts by Dacotah in North Dakota and by S & MC2 a week later in Virginia. *See Fuisz v. Selective Ins. Co.*, 61 F.3d 238, 241 (4th Cir.1995) (concluding under Virginia law that the laws of the place of contracting governs the validity of a contract); *Keco Indus., Inc. v. ACF Indus., Inc.*, 316 F.2d 513, 514 (4th Cir.1963) (stating that under Virginia law, the place of contracting is determined by the location of the last act necessary to complete the contract).

**7.** 12 U.L.A. 194 (1996). Virginia's § 8.01–35.1 was specifically modeled after the UCATA as adopted in North Carolina, *see* Rigsby, *supra* note 4, at 813–14, and its language generally tracks that of § 4 of the UCATA.

**8.** These states include Arizona, Colorado, Florida, Massachusetts, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, and Tennessee. Alaska repealed the Uniform Contribution Among Tortfeasors Act in 1989. 12 U.L.A. at 185, 189 (1996).

**9.** *See* Commissioners' Comment, 12 U.L.A. at 265 ("It seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit.").

**10.** According to the drafters, the requirement "gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge" of liability. Commissioners' Comment, 12 U.L.A. at 265. Prior to the 1955 revisions that included the addition of the "good faith" requirement, the UCATA had provided that a release of any tortfeasor should not release him from liability from contribution unless it expressly provided for a reduction "to the extent of the

■ Given these two UCATA goals, it is not surprising that most UCATA states that have addressed the question have interpreted the "good faith" requirement as barring releases based on collusion or other tortious or wrongful conduct such as fraud or dishonesty between the plaintiff and settling tortfeasor.[11] Such a test accommodates both goals underlying the UCATA. By defining and limiting the conduct that will compromise the good faith of a release, the states adopting the collusion or other tortious or wrongful conduct test have minimized uncertainty in application of the standard and thus encouraged settlements. At the same time, by refusing to characterize collusive or tortious settlements as "good faith" settlements, these states have guarded against significant misallocations of burdens among joint tortfeasors.

Not all states subscribe to the view that "good faith" in this context means the absence of collusion or other tortious or wrongful conduct. Some, led by California, place controlling emphasis on the goal of equitable allocation.[12] Under this rule, the "good faith" provision demands that the trial court consider "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." *Tech–Bilt v. Woodward–Clyde & Assocs.*, 38 Cal.3d 488, 213 Cal.Rptr. 256, 698 P.2d 159, 166 (Cal.1985). A settlement within this "reasonable range" meets the "good faith" requirement, while a settlement that releases a tortfeasor from all claims in exchange for an amount far less than the tortfeasor's proportional liability would likely fail the "good faith" test, regardless of whether any collusion or other tortious conduct infected the settlement.[13] It is this more restrictive California rule of "good faith" that Versatility champions.

Several reasons compel the conclusion that Virginia would reject the "reasonable range" rule of "good faith" under § 8.01–35.1. First, the UCATA's policy in favor of encouraging settlement argues against a "reasonable range" rule, since the difficulty of predicting and apportioning future liability assessments would tend to hinder partial settlements in

---

pro rata share of the released tortfeasor" of the injured person's recoverable damages:

> The idea underlying the 1939 provision was that the plaintiff should not be permitted to release one tortfeasor from his fair share of liability and mulct another instead, from motives of sympathy or spite, or because it might be easier to collect from one than from the other; and that the release from contribution affords too much opportunity for collusion between the plaintiff and the released tortfeasor against the one not released.

12 U.L.A. at 265. Yet, this provision injected uncertainty into settlement discussions since plaintiffs agreeing to a pro rata reduction had no idea how much they were giving up, and this uncertainty discouraged settlements. *Id.* On balance, it appears that the drafters added the "good faith" requirement both to prevent collusive settlements that, *inter alia*, result in significantly inequitable distribution of damages among tortfeasors and to remove the barriers to settlement created by the previous rule.

11. *See, e.g., Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 758 n. 32 (Alaska 1992)("[Good faith] does not require that the settling parties advance the interests of the nonsettling defendant. Rather, they must simply refrain from 'tortious or other wrongful conduct.' "); *Copper Mountain v. Poma of Am.*, 890 P.2d 100, 107 (Colo.1995)("[A] settlement is reached in 'good faith' in the absence of collusive conduct.... [Conduct is collusive] when it is aimed to injure the interests of an absent tortfeasor.").

12. Although California has not adopted the UCATA, its statutory language substantially parallels that of § 4 of the UCATA. *See* Cal.Civ.Proc.Code § 877.6. In any event, a few states that have adopted the UCATA have followed California's good faith jurisprudence. *See, e.g., International Action Sports v. Sabellico*, 573 So.2d 928 (Fla. Dist.Ct.App.1991).

13. Courts applying the California rule do not automatically find bad faith when a settling defendant pays less than his proportional share. Rather, several additional factors are part of the analysis "including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants." *Tech–Bilt*, 213 Cal. Rptr. 256, 698 P.2d at 166.

multiple tortfeasor cases.[14] Second, a "reasonable range" rule requires the trial court to engage in speculative, unreliable predictions regarding ultimate jury pronouncements on the subject of damages, liability, and proportional responsibility.[15] Finally, and perhaps most importantly, while the California statute giving rise to the *Tech–Bilt* standard is similar to the UCATA, that statute is based on considerations peculiar to California jurisprudence. *See Smith v. Monongahela Power Co.*, 189 W.Va. 237, 429 S.E.2d 643, 650 (W.Va.1993) ("The California court's decision in Tech–Bilt was grounded ... on its interpretation of the legislative intent underlying [the California statute]."). Specifically, the *Tech–Bilt* court concluded that the statute represented a codification of earlier California court opinions that explicitly stressed the importance of an appropriate allocation of liability costs among tortfeasors in establishing good faith. *Tech–Bilt*, 213 Cal.Rptr. 256, 698 P.2d at 164–66.

These reasons help explain why under the UCATA, and hence under § 8.01–35.1, "good faith" is measured not by the "reasonable range" rule, but by the "collusion or other tortious conduct" rule. Under the former rule, a disproportionately small settlement payment by one of several joint tortfeasors is essentially controlling on the absence of good faith, while it is merely one of many facts to be evaluated in ascertaining whether a release is the product of collusion or other tortious or wrongful conduct.

Virginia law's treatment of "good faith" in contexts other than § 8.01–35.1, the second clue, bolsters the conclusion that Virginia

would adopt the "collusion or other tortious conduct" standard. The Supreme Court of Virginia has explicitly equated a good faith settlement with a settlement made in the absence of fraud or collusion. *See, e.g., Provident Fire Ins. Co. v. Union Trust Corp.*, 195 Va. 415, 421, 78 S.E.2d 584, 587–88 (1953) ("Therefore, if the release executed by the insured was in good faith, without fraud or collusion, it is binding on the plaintiff.").

The third clue—the statute's overall scheme—also supports the conclusion that a release is given in "good faith" under § 8.01–35.1 only if it is the product of an arm's length negotiation untainted by collusion or other tortious or wrongful conduct. A tortfeasor released from liability under § 8.01–35.1 is discharged from liability for contribution to a nonsettling tortfeasor, whose liability for the same injury is reduced, in turn, by the consideration the settling tortfeasor exchanges for the release. In practical effect, this results in a kind of contribution among tortfeasors. Thus, it is apparent that in a multiple tortfeasor setting, a plaintiff's settlement with one or fewer than all tortfeasors can significantly affect the interests of the nonsettling tortfeasors. It is also apparent that § 8.01–35.1 contemplates that the interests of the non-settling tortfeasors are adequately protected if the settlement is a noncollusive arm's length transaction. In arm's length negotiations, plaintiffs attempt to obtain as much as possible and defendants seek to pay as little as possible.[16] A plaintiff's self-interest makes it unlikely that plaintiff will settle with any single tortfeasor for an

---

**14.** *See Copper Mountain*, 890 P.2d at 105 ("The Tech–Bilt analysis has come under considerable criticism for its potentially negative impact on the policy encouraging settlement."); *Noyes v. Raymond*, 28 Mass.App.Ct. 186, 548 N.E.2d 196, 199 (Mass.App.Ct.1990)("A rule whereby a determination of lack of good faith could be based only on the amount of a settlement would require trial courts to apply an unworkable standard to every settlement. It would clog our trial courts with unnecessary hearings, discourage the settlement of legitimate claims, and severely strain the resources of the parties and the trial and appellate courts of this state."); *Mahathiraj v. Columbia Gas of Ohio*, 84 Ohio App.3d 554, 617 N.E.2d 737, 741 (Ohio Ct.App.1992)("[T]he Tech–Bilt requirement may ultimately discourage parties from voluntarily settling cases because of the

uncertainty and expense involved in defending settlements against proportionality claims.").

**15.** *See Mahathiraj*, 617 N.E.2d at 741 ("Moreover, the *Tech–Bilt* standard would prove cumbersome, if not unworkable, in many cases because it forces courts to foresee whether a jury would find a particular party liable, and if liable, the proportion of liability the party would likely bear as well as the sum of damages the jury would award.").

**16.** *See generally Barmat v. John and Jane Doe Partners A–D*, 165 Ariz. 205, 797 P.2d 1223, 1227 (Ariz.Ct.App.1990) (discussing incentives in arm's length settlement negotiations under the UCATA).

unreasonably low amount, which in turn tends to prevent significantly inequitable allocations of financial liability among tortfeasors. To be sure, the statute's overall scheme does not guarantee a wholly equitable result, but such a result is generally encouraged by the statute.[17] *Cf. Smith*, 429 S.E.2d at 649 (noting that "the good faith test carries inherent safeguards in view of the low probability that a plaintiff will enter into a nominal settlement with a solvent defendant whose liability is significant").

█ The collusion proscribed by the good faith standard occurs when the arm's length negotiation between plaintiff and settling tortfeasor breaks down. If the plaintiff no longer seeks to gain as much as possible through settlement, but is otherwise motivated, the nonsettling defendant is left exposed, his interests unprotected in a transaction that may significantly affect those interests.[18] Collusion in violation of the § 8.01–35.1 "good faith" standard occurs when the release is given with the tortious purpose of

intentionally injuring the interests of nonsettling parties, rather than as the product of arm's length bargaining based on the facts of the case and the merits of the claim.[19] When settlement ceases to be the result of a bargain at arm's length, it is no longer a "good faith" settlement.[20]

█ It remains to determine whether the release Dacotah gave S & MC2 in this case was the product of collusion or other tortious or wrongful conduct. Analysis begins with the presumption that the settlement has been made in good faith, and the burden is on the challenging party to show that the settlement is infected with collusion or other tortious or wrongful conduct.[21] Versatility has carried that burden here.

█ Dacotah concedes that the primary motivation for the release was its desire to use the services of S & MC2's lawyers. Yet this concession falls short of the realities of the situation. The expertise and experience

---

**17.** Put another way, § 8.01–35.1 does not mandate the impossible, namely that the ultimate allocation among tortfeasors be precisely equal or correct. A plaintiff may undervalue his claim against one tortfeasor and settle for an amount that, in comparison with the liability ultimately adjudged, is low given the tortfeasor's contribution to the injury. That a plaintiff may bargain ineptly and still act in good faith accords with Virginia law's interpretation of "good faith" in other contexts. *Cf., e.g., Bankers Trust (Delaware) v. 236 Beltway Inv.*, 865 F.Supp. 1186, 1197 n. 15 (E.D.Va.1994) ("Virginia law defines good faith as honesty in fact in the conduct or transaction concerned. Bad faith requires knowing dishonesty, not merely carelessness.")

**18.** This does not mean that the good faith standard never permits a low, conservative settlement. In some instances in which the plaintiff seeks to extract the most money possible from the settling defendant, that amount might be very little indeed.

**19.** A settlement motivated by tactical gain is not necessarily one in bad faith. "Obviously, litigation involves a constant effort to acquire a tactical advantage over an opponent." *Smith*, 429 S.E.2d at 652 n. 13. Indeed, "[a]ll settlements are "tactical" in some sense . . . . Implicit in the nature of the settlement process is the tactical decision a party makes between gambling on the possibility of greater or lesser liability should the case go to trial." *Mahathiraj*, 617 N.E.2d at 743 n. 3. The tactical gain must be accomplished, however, through an arm's length settlement.

**20.** This notion of collusion might be profitably compared with the definition of collusion in settlement crafted by this Court in a different context: "In essence, collusion is simply fraud accomplished by two or more persons," while fraud includes "a breach of legal or equitable duty, which, irrespective of moral guilt . . . the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests," *Spence–Parker v. Maryland Ins. Group*, 937 F.Supp. 551, 560–61 (E.D.Va.1996).

**21.** This presumption is consistent both with other states' practice under the UCATA and similar statutes and with the good faith standard as applied in other contexts in Virginia law. *See Barmat*, 797 P.2d at 1227–28 ("We note that other jurisdictions that have adopted the [UCATA] place the burden on the challenging party to prove lack of good faith. . . . We presume that [parties to an agreement] acted in good faith and require the challenging party to prove the lack thereof."); *Wheeler v. Denton*, 9 N.C.App. 167, 175 S.E.2d 769, 772 (N.C.Ct.App.1970) ("The burden of showing a lack of good faith is on the party asserting it."); *State Farm Mut. Auto. Ins. Co. v. Floyd*, 235 Va. 136, 144, 366 S.E.2d 93, 98 (1988) ("Although not amounting to fraud in this context, 'bad faith' runs counter to the presumption that contracting parties have acted in good faith."). The party alleging bad faith must prove this contention by clear and convincing evidence. *See State Farm*, 366 S.E.2d at 98; *accord Smith*, 429 S.E.2d at 651–52.

of S & MC2's lawyers was only one of the benefits that accrued to Dacotah as a result of the one dollar release. Another important benefit was that Dacotah would now know everything S & MC2 knew about the transaction in issue, including the nature and identity of documentary evidence and witnesses adverse to Versatility. Equally important, the release meant that Dacotah would not have to contend with S & MC2 as an adversary,[22] but would instead enjoy the benefits of S & MC2's cooperation in its quest for recovery against Versatility. Thus, the realities of the situation reflect that Dacotah gave up its claim against S & MC2 in return for one dollar and S & MC2's cooperation in connection with Dacotah's pursuit of its claim against Versatility. When an alliance harmful to the nonsettling party is the essential object of a release, that release is not given in good faith. Put another way, the one dollar release reflects not an arm's length settlement bargain, but a collusive alliance of Dacotah and S & MC2 against Versatility. A release is not given in "good faith" under § 8.01–35.1 where, as here, the principal purpose of a release is to facilitate a collusive alliance against a non-settling tortfeasor.

Dacotah claims it also settled because it believed S & MC2 had no significant assets and because the results of the earlier arbitration warranted the conclusion that S & MC2's liability was small or nonexistent.[23] There is no persuasive evidence before this Court that S & MC2 is without assets. Furthermore, as the collateral estoppel analysis detailed below demonstrates, S & MC2's arbitration award did not have necessary implications for Dacotah's claim against it. Thus, neither of these justifications are of sufficient force to overcome the conclusion that the settlement would not have taken place absent the impermissibly collusive motivation.

■ Given that the release was not given in good faith, as required by § 8.01–35.1, the next question is what consequences flow from this conclusion. One consequence, anticipated by the UCATA drafters, is that "there is no discharge," at least of the colluding tortfeasor. 12 U.L.A. 265. Thus, the release is ineffective to discharge S & MC2 from any liability to Dacotah. A further consequence is that the release is void and of no effect at all, as Virginia law teaches that a contract made in bad faith is contrary to public policy and hence void.[24]

*Jones v. General Motors Corp.*, 856 F.2d 22, 24 (4th Cir.1988), is not to the contrary. That decision held that because § 8.01–35.1 only applied to written releases,[25] an oral release of a single tortfeasor served to release all tortfeasors. This was because such a release, while not covered by § 8.01–35.1, was nonetheless still effective under the common law. By contrast, the release here is not merely ineffective under § 8.01–35.1, but void under the common law. Thus, S & MC2 and Phillips are not exempt from Versatility's third-party action against them, and Dacotah may continue in its claims against Versatility.

### IV.

■ S & MC2 disputes the third-party complaint's implied indemnity claims on the

---

**22.** Even if Dacotah had chosen not to sue S & MC2, Versatility's decision to make S & MC2 a third-party defendant nonetheless makes Dacotah and S & MC2 adversaries, as S & MC2's liability is only derivative of Versatility's. If Dacotah's claim against Versatility were to fail, the third party claim would also fail. Absent the settlement, it would be in S & MC2's interest to attach Dacotah's claim or, at a minimum, to do nothing to aid Dacotah.

**23.** These two professed beliefs are in some conflict with each other, since S & MC2's victory in the arbitration means that it recently had at least $267,582 in assets.

**24.** *See Deeds v. Gilmer,* 162 Va. 157, 252, 174 S.E. 37, 74 (1934) (indicating that a contract made in bad faith would be void or voidable for reasons of public policy); *see generally* 4B *Michie's Jurisprudence of Virginia and West Virginia,* Contracts § 115 ("Whatever tends to injustice or oppression, restraint of liberty, commerce, and natural or legal right; whatever tends to the obstruction of justice, or to the violation of a statute; and whatever is against good morals, when made the object of a contract, is against public policy and therefore void and incapable of enforcement.").

**25.** Since the *Jones* decision, the Virginia legislature has amended § 8.01–35.1 to include oral releases. *See Allianz Ins. Co. v. Garrett,* 47 F.3d 665, 666 (4th Cir.1995).

ground that such claims are barred in the face of the express indemnity provision contained in the contract between S & MC2 and Versatility.

Principles of implied indemnity do not operate in the face of an express indemnification contract. *See Fidelity and Deposit Co. of Maryland v. Bristol Steel & Iron Works,* 722 F.2d 1160, 1163 (4th Cir.1983) (citing case law from many jurisdictions for principle as one uniformly upheld); *International Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.,* 838 F.2d 124, 126 (4th Cir. 1988) (holding that under Virginia law, an implied right to indemnification may be found in the *absence* of an express indemnification provision). Here, the reseller agreement between Versatility and S & MC2 contains an indemnification provision that would have applied only if Versatility referred systems integration work to S & MC2, which did not occur. Given that Versatility and S & MC2 contracted for a particular indemnity arrangement, "the rights of [S & MC2] are not to be determined by general 'indemnity principles,' as relied on by [Versatility], but by the letter of the ... contract of indemnification." *Fidelity and Deposit Co.,* 722 F.2d at 1163. To hold parties to one indemnification arrangement when they had contracted for another would do violence to the intentions that formed the basis of their contract.

Even if implied indemnification *were* appropriate in the face of an express contractual provision addressing indemnity, it would not be available here. While "an implied right to indemnity may be read into some contracts, only unique factors or a special relationship between the parties give rise to such a right." *TransDulles Ctr. v. USX Corp.,* 976 F.2d 219, 228 (4th Cir.1992). No unique factors or special relationship here warrants such a reading. Versatility's heavy reliance on *United States v. Savage Truck Line,* 209 F.2d 442 (4th Cir.1953), is misplaced. That case dealt with a common car-

rier, the rights and liabilities of which are fixed by federal statutes and common law as well as by the terms of the contract itself. *Id.* at 445. The unusual degree of care legally demanded of common carriers creates a special relationship justifying the imposition of implied indemnity. The situation is not analogous to the S & MC2–Versatility contract, where no unique relationship existed beyond the fact of the contract itself.

S & MC2 and Phillips' motion for summary judgment on Versatility's indemnification claims must therefore be granted.

**V.**

S & MC2 asserts that the earlier arbitration award collaterally estops Versatility from claiming contribution from it. This assertion fails, as S & MC2 cannot meet its burden of proof on this issue,[26] and so the arbitration award does not collaterally estop this proceeding.

For collateral estoppel to apply, "(1) the parties to the prior and subsequent proceedings must be the same, (2) the factual issue sought to be litigated actually must have been litigated in the prior action, (3) the factual issue must have been essential to the judgment in the prior proceeding, and (4) the prior action must have resulted in a judgment that is valid, final, and against the party against whom the doctrine is sought to be applied."[27] *Angstadt v. Atlantic Mut. Ins. Co.,* 249 Va. 444, 457 S.E.2d 86, 87 (Va.1995). The parties correctly agree that the only point of contention here is the third element of this test. Versatility would be collaterally estopped from asserting its contribution claim only if the arbitration award necessarily included a finding absolving S & MC2 of any actual or constructive fraud in its dealings with Dacotah. Because it does not, collateral estoppel does not apply.

The arbitrators issued no factual findings or written or oral explanation of their award in favor of S & MC2. The situation is analo-

---

**26.** Movants bear the burden of proof on collateral estoppel. *Rhodes v. Commonwealth,* 223 Va. 743, 749, 292 S.E.2d 373, 376 (1982).

**27.** In determining whether this test is met, a court may look beyond the pleadings to the larg-

er trial record and, if that is inconclusive, to extrinsic evidence. *In re Wauban,* 121 F.3d 702, 1997 WL 436936, No. 96–1427, 1997 U.S.App. LEXIS 20847, at *9 (4th Cir. Aug. 5, 1997).

gous to one in which a jury issues a general verdict in a multi-claim suit: in that instance, the inquiry must be "whether a rational [fact-finder] could have reached a conclusion based on an issue other than that" which the party asserting collateral estoppel wishes to foreclose from consideration. *See Ashe v. Swenson*, 397 U.S. 436, 444, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Multiple bases of decision were available to the arbitrators in this case.

Based upon the final briefs in the arbitration, it appears that S & MC2 had, by arbitration's end, ceased to pursue any claim but fraud.[28] In the end, the arbitrators' inquiry had narrowed to whether Versatility fraudulently misrepresented the functions of its software systems. S & MC2 could not have recovered in the arbitration panel on a theory of fraud unless the panel found that S & MC2's actions in reliance on that fraud were reasonable, *i.e.*, neither themselves fraudulent or negligent.[29] But this finding does not absolve S & MC2 of responsibility for the damages to Dacotah. Versatility could presumably succeed in its contribution, action against S & MC2 if it demonstrated that S & MC2 perpetrated constructive fraud

against Dacotah, and such constructive fraud comprises innocent misrepresentations if the injured party was damaged by its reliance upon the misrepresentation. *See, e.g., Mortarino v. Consultant Eng'g Servs.*, 251 Va. 289, 295, 467 S.E.2d 778, 782 (1996). S & MC2's victory in the arbitration thus does not indicate that it could not be held liable for constructively defrauding Dacotah, since in Virginia, innocent misrepresentations may constitute constructive fraud.

In addition, the arbitration addressed more than the Dacotah sale; also presented there was fraud relating to the sale of a system to Fronteer, another customer. If Versatility had made identical statements about the multiple campaign capabilities of its software in each case, or if it had made a single set of representations that S & MC2 had reasonably relied on in both cases, Versatility's fraud regarding Fronteer would also be its fraud regarding Dacotah, and no distinction between the two situations would be warranted. The current record, however, does not prove this identity,[30] and thus permits the inference that the arbitration award was based on the Fronteer transaction, as distinct from the Dacotah transaction.[31] For

**28.** S & MC2's final brief in the arbitration put forward only theories of fraud in its assessments of Versatility's liability in damages. While it referred to Versatility's rescission of its contract with S & MC2 in violation of that contract's 30-day notice provision S & MC2 did not appear to attempt to base recovery on that theory. Similarly, in its closing statement, S & MC2 rested its case only upon allegations of Versatility's fraud. Such an informal abandonment of claims is not inconsistent with the general tone and pace of arbitration proceedings. While Versatility's final brief provided detailed defenses for three of the four claims originally put forward, it is unlikely that the arbitration panel was moved to hold against Versatility in the face of Versatility's un-rebutted arguments on the breach of contract and warranty issues.

**29.** The necessary elements of a fraud claim include (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *See Meridian Title Ins. Co. v. Lilly Homes, Inc.*, 735 F.Supp. 182 (E.D.Va.1990). The reliance must be innocent and justified under the circumstances. *See In re: Loudoun Plumbing and Heating, Inc.*, 13 B.R. 232 (Bankr. E.D.Va.1981). Constructive fraud is the breach

of a legal or equitable duty that the law declares fraudulent regardless of the actual intent of the defendant because of its tendency to deceive and to violate confidence. *See Nuckols v. Nuckols*, 228 Va. 25, 320 S.E.2d 734, 741 (Va.1984). While constructive fraud does not require a showing of an intent to deceive, its elements are otherwise the same as an actual fraud claim and include the requirement of reliance.

**30.** In particular, S & MC2 claimed in the arbitration that "Versatility knowingly delivered and installed a fatally defective GWPTA 6.0/Versatility software combination on the Fronteer file server." S & MC2 Post Hearing Mem. at 6. No such installation of defective software was alleged in relation to the sale to Dacotah. If this Fronteer installation constituted the whole of Versatility's fraud, and the arbitration award gives us no reason to conclude that it did not, the award has no necessary implication for the reasonableness of S & MC2 and Phillips' behavior in the Dacotah sale.

**31.** Alert parties to the arbitration might reasonably have anticipated this litigation and thus requested specific findings of the arbitrator, which request should have been granted in the interest of avoiding duplicative litigation.

these reasons, S & MC2's motion for summary judgment on Versatility's contribution claims must be denied.

## VI.

Given this disposition of the motion for summary judgment, the Munves firm currently represents plaintiff and third-party defendants, parties with adverse interests. In these circumstances, the Munves firm has a conflict of interest. It is the nondelegable duty of the Court to ensure high standards of professional conduct in the management of cases before it and to prevent even the appearance of impropriety. *In re Asbestos Cases*, 514 F.Supp. 914, 919–20 (E.D.Va. 1981). Disqualification is warranted when the conflict of interest is not just conjectural, but is actual or likely. *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F.Supp. 724, 729 (E.D.Va.1990). Just such an actual conflict is presented here. The Munves firm cannot continue to represent both parties simultaneously unless it is "obvious" that adequate multiple representation is possible. *In re Stancraft Corp.*, 39 B.R. 748, 754 (Bkrtcy.E.D.Va.1984). It is not at all obvious in this case. "In determining whether to disqualify counsel for conflict of interest, the trial court ... with a view of preventing the appearance of impropriety, is to resolve all doubts in favor of disqualification." *United States v. Clarkson*, 567 F.2d 270, 273 n. 3 (4th Cir.1977). As a result, the motion to disqualify must be granted.[32]

The Clerk is directed to send copies of this Memorandum Opinion to counsel of record.

---

**32.** Whether the Munves firm may continue to represent either party singly is a question that is neither presented nor reached. In the first instance, it is for the Munves firm to weigh its ethical obligations in this matter and make its decision accordingly.