632 S.E.2d 296

HEARTLAND, L.L.C., a West Virginia Limited Liability Company, Carl D. Siegel, Rebecca A. Sears, and Hickory Plains, L.L.C., a Maryland Limited Liability Company Plaintiffs Below, Appellants

v.

McINTOSH RACING STABLE, L.L.C., a Virginia Limited Liability Company Defendant Below, Appellee.

No. 32894.

Supreme Court of Appeals of West Virginia.

Submitted March 29, 2006.

Decided May 12, 2006.

Michael J. Farrell, Robert L. Hogan, Farrell, Farrell & Farrell, L.C., Huntington, for the Appellants.

Kenneth J. Barton, Jr., Brendan S. Leary, Steptoe & Johnson, P.L.L.C., Martinsburg, for the Appellee.

ALBRIGHT, Justice:

This is an appeal by Heartland, L.L.C., Carl D. Siegel, II, Rebecca A. Sears, and Hickory Plains, L.L.C., (hereinafter "Appellants") from a summary judgment order entered by the Circuit Court of Jefferson County in favor of the Appellee, McIntosh Racing Stable, L.L.C. (hereinafter "Appellee" or "McIntosh Racing"). The Appellants instituted this civil action against the Appellee for breach of contract regarding the sale of a horse stable located in Jefferson County, West Virginia. The Appellants contend that the lower court erred by granting summary judgment in favor of the Appellee and maintain that genuine issues of material fact remain for jury determination. Upon thorough evaluation of the record, briefs, arguments of counsel, and applicable precedent, this Court reverses the summary judgment order of the lower court and remands this matter for further proceedings consistent with this opinion.

## I. Factual and Procedural History

On January 12, 2003, Dr. Siegel, Ms. Sears, and Marc J. Sharp entered into a written purchase agreement to purchase a horse stable [1] and real estate from the Appellee, McIntosh Racing, for $400,00.00.[2] In February 2003, a severe snow storm caused a portion of the stable's roof to collapse, necessitating extensive repair. On April 4, 2003, a dry closing [3] was conducted, with attorney

---

1. The stable consists of 43 stalls and is located in Ranson, Jefferson County, West Virginia.

2. The initial purchasers, Dr. Siegel, Ms. Sears, and Mr. Sharp, paid a $10,000.00 earnest money deposit.

3. The term "dry closing" was employed by the parties to distinguish this closing from one in which the sale is completed at the closing. The evidence before this Court raises a claim that the parties apparently anticipated that all documents would be signed at this dry closing and that the parties would discuss and agree upon additional issues which needed to be finalized prior to completion of the sale. The brief of the Appellee, for instance, indicates that "[s]ince no money was exchanged at the closing, the closing was considered a 'dry closing.'" The brief of the Appellee also indicates, however, that Dr. Siegel, Ms. Sears, and Hickory Plains did in fact place a $60,000.00 down-payment in Mr. Howard's trust account at the dry closing. The Appellee never received that money since those funds were returned to the purchasers when the Appellee undertook to rescind the contract.

Charles Howard jointly retained to handle the closing. The record contains significant deposition testimony regarding the discussions and agreements generated at this dry closing. Mr. John McIntosh, owner of the horse stable and representative of Appellee McIntosh Racing, participated in the dry closing. The initial purchasers, including Mr. Sharp, Dr. Siegel, and Ms. Sears, also participated in the dry closing. Attendees also included Randy L. Cohen, representative of Hickory Plains, L.L.C.; Sarah Stern, daughter of Mr. McIntosh; and Franklin "Greg" Smith, a horse trainer working with Mr. Cohen.

The Appellants contend that the parties agreed at the dry closing that one of the original purchasers, Mr. Sharp, was to be replaced by purchaser Hickory Plains, L.L.C., represented at the dry closing by Mr. Cohen. Hickory Plains, L.L.C. would then partner with Dr. Siegel and Ms. Sears to create Heartland, L.L.C. (hereinafter "Heartland"). The Appellants also contend that based upon the required roof repairs, the parties agreed that the purchase would not be completed until the Appellee had repaired the roof and had obtained a certificate of occupancy for the stable.

Furthermore, the Appellants maintain that there was considerable discussion at the dry closing regarding the fact that Mr. Siegel, Ms. Sears, and Hickory Plains, L.L.C., intended to create the limited liability company under the name of Heartland, to own and manage the horse stable being purchased. The record reveals that the Articles of Organization for Heartland were signed at the dry closing, in the presence of Mr. McIntosh and all attendees. The attorney, Mr. Howard, testified that he had planned to file those Articles of Organization with the West Virginia Secretary of State's office at a later date, thereby officially creating the legal entity of Heartland. A limited liability compa-

ny is a specialized type of organizational entity, first established in this state in 1996 and presently appearing in Chapter 31B of the West Virginia Code.[4] West Virginia Code § 31B–2–201 (1996) (Repl. Vol. 2003) specifies that "[a] limited liability company is a legal entity distinct from its members." *See also* Larry E. Ribstein, *A Critique of the Uniform Limited Liability Company Act*, 25 Stetson L.Rev. 311 (Winter 1995).

Based upon the intent to formally organize a limited liability company under the name of Heartland, the deed to the property was prepared with the grantee name of Heartland. A deed of trust was executed at the dry closing for the balance of the purchase price, $330,000.00, with the Appellee as the lender.

On April 18, 2003, a notice of condemnation was issued regarding the stable. Repairs were apparently attempted during the ensuing months, but the purchase was never completed.[5] On August 15, 2003, the Appellee sought to rescind the agreement to sell the stable to Heartland based upon the fact that Heartland had not been properly organized under West Virginia law as a limited liability company. The Appellee contended that it had not entered into a binding contract with a competent party since Heartland did not technically exist at the time the deed was signed. The Appellee maintains that it had no knowledge that Heartland was not a formally organized limited liability company at the time the deed was signed at the dry closing. Mr. McIntosh testified in his deposition that he was unaware of the status of the formation of Heartland during the dry closing. He was, however, aware that repairs to the roof of the stable needed to be completed before the transaction could be completed.

On October 1, 2003, Heartland's Articles of Organization were filed with West Virginia

---

4. West Virginia Acts of the Legislature 1996, c. 256, provided that this chapter would take effect on July 1, 1996.

5. The record reveals that the condition of the barn, subsequent to the collapse of the roof, required the Appellee to request that the tenants remove their horses to permit renovations to proceed. The Appellee apparently encountered

resistance from some of the tenants, occasioning further delay. The Appellee also submitted a property damage claim to its insurer, requiring additional evaluation of the extent of needed repairs in order to obtain indemnity asserted to be applicable under the insurance contract for the loss suffered to the damaged property.

Secretary of State's Office. The Appellants instituted this civil action the following day, seeking specific performance and alleging breach of contract. Subsequent to substantial discovery, the lower court granted the Appellee's motion for summary judgment on March 16, 2005, finding as follows: (1) Heartland was not a party to the contract since it did not exist until October 1, 2003; (2) Heartland unreasonably delayed in filing Articles of Organization after the documents were signed at the dry closing on April 4, 2003; (3) purchase, deed, and loan documents signed at the dry closing lacked mutuality of remedy and mutual assent; (4) there was no proper assignment of interest in accordance with Statute of Frauds; [6] and (5) the Appellee was justified in rescinding the contract because the initial purchasers did not attempt to close the transaction within a reasonable period of time.

■ The Appellants contend that the lower court erred by granting summary judgment based upon the following: [7] (1) questions of fact exist regarding the agreements made at the dry closing, thereby precluding summary judgment; (2) the assignment of the right to become a participant in the transaction did not violate the Statute of Frauds; and (3) the lower court should have permitted a jury to determine the reasonableness of the delay in attempting to close the transaction.

## II. Standard of Review

■ Pursuant to Rule 56 of the West Virginia Rules of Civil Procedure, summary judgment is required when the record reveals that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.Va.R.Civ.Pro. 56(c); *see also Hager v. Marshall*, 202 W.Va. 577, 505 S.E.2d 640 (1998). In reviewing a lower court's entry of summary judgment, this Court applies a *de novo* review. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*").

■ This Court has repeatedly stated that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). *See also* Syl. Pt. 1, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). In syllabus point four of *Aetna Casualty*, this Court explained: "If there is no genuine issue as to any material fact summary judgment should be granted but such judgment must be denied if there is a genuine issue as to a material fact."

■ In determining whether a genuine issue of material fact exists, this Court construes the facts in the light most favorable to the party against whom summary judgment was granted. *Masinter v. WEBCO Co.*, 164 W.Va. 241, 242, 262 S.E.2d 433, 435 (1980); *Alpine Prop. Owners Assn. v. Mountaintop Dev. Co.*, 179 W.Va. 12, 17, 365 S.E.2d 57, 62 (1987). Syllabus point six of *Aetna Casualty* also explains: "A party who moves for summary judgment has the burden of showing that there is no genuine issue of material fact and any doubt as to the existence of such issue is resolved against the movant for such judgment." [8]

---

6. West Virginia Code § 36-1-3 (1923) (Repl. Vol. 2005), provides as follows: "No contract for the sale of land, or the lease thereof for more than one year, shall be enforceable unless the contract or some note or memorandum thereof be in writing and signed by the party to be charged thereby, or by his agent. But the consideration need not be set forth or expressed in the writing, and it may be proved by other evidence."

7. The lower court granted an extension of time to appeal, to which the Appellee objected. Upon appeal to this Court, the Appellee cross-assigned error, alleging that the lower court erred by permitting the Appellants to have additional time within which to file a petition for appeal. This Court finds no merit in the Appellee's cross-assignment of error. The decision to extend the time within which an appeal may be filed is properly within the discretion of the lower court. We find no justification for disturbing the lower court's decision in this regard. *See* W. Va.Code § 58-5-4 (1998) (Repl. Vol. 2005).

8. Syllabus point five of *Jividen v. Law*, 194 W.Va. 705, 461 S.E.2d 451 (1995), defines "genuine issue" in the following manner:

## III. Discussion

### A. The Deed

In evaluating issues surrounding the sale of real property, particularly with reference to the validity of a deed, this Court explained as follows in syllabus point seven of *Proudfoot v. Proudfoot*, 214 W.Va. 841, 591 S.E.2d 767 (2003): "A deed must be upheld if possible. All instruments must be so construed as to pass an estate, when such was the intention; and it will be presumed from the making of a deed that the grantor intended to convey some property by it." This Court has also specified, in syllabus point one of *Hardin v. Collins*, 125 W.Va. 81, 23 S.E.2d 916 (1942), that "[a] deed will not be set aside for incapacity of the grantor, or for undue influence, misrepresentations, or fraud upon the part of the grantee, except upon a clear showing of one or more of these facts by the evidence."

Regarding the necessity of delivery of a deed and the finality of the transaction on the exact date of the signing of the deed, this Court explained in *Hawley v. Levy*, 99 W.Va. 335, 128 S.E. 735 (1925), that in the "absence of evidence to the contrary, an instrument is supposed to become effective on the date it bears. This is merely a presumption, however, and may be rebutted by evidence. Even in case of a deed, the actual date of delivery may be shown, and if the time of delivery is different from the date of the instrument, the deed is effective only from the date of delivery." 99 W.Va. at 339, 128 S.E. at 736. In *Bennett v. Neff*, 130 W.Va. 121, 42 S.E.2d 793 (1947), this Court held that "[a] deed, however, is not delivered when something remains to be done by the parties who propose to deliver it, or when the delivery is upon the condition that it shall not take effect until executed by all the grantors and it is never executed by all of them" 130 W.Va. at 138, 42 S.E.2d at 802.

The grantor in the present case, Appellee McIntosh Racing, maintains that sum-mary judgment in its favor was proper based upon the fact that the grantee, Appellant Heartland, L.L.C., had not yet been formally organized as a legal entity on the date upon which the deed was signed. The Appellants, however, contend that certain conditions, allegedly agreed upon during the dry closing, had to be satisfied prior to the completion of this real estate transaction.

Regarding a question similar to the one presented in the case sub judice, this Court, in *Spring Garden Bank v. Hulings Lumber Co.*, 32 W.Va. 357, 9 S.E. 243 (1889), explained as follows: "The first question presented is: Is the deed to the Hulings Lumber Company void, because at the date of said deed, the said company had not been incorporated." 32 W.Va. at 360, 9 S.E. at 244. The *Spring Garden* Court resolved that question as follows:

> I have been unable to find any case, in which it has been decided, that a deed made to a corporation having a potential existence at the date of the deed, and which had obtained its charter and completed its organization at the time the deed was delivered to it, was void or ineffectual as a conveyance to the corporation. On the contrary in *[Rotch's] Wharf Co. v. Judd*, 108 Mass. 224, the court held, that a deed conveying land to a corporation dated after the date of its charter and before its organization was a valid conveyance. The court, in its opinion, on page 228, says: "The acceptance of the deed will be presumed as soon as the plaintiffs (the corporation) were competent to take it. [*Concord*] *Bank v. Bellis*, 64 Mass. 276, 10 Cush. 276; *Ward v. Lewis*, 21 Mass. 518, 4 Pick. 518; *Bank [of U.S.] v. Dandridge*, 12 Wheat. [25 U.S.] 64, 70, 6 L.Ed. 552. And these plaintiffs could accept a deed as soon as they became competent to make a contract under their charter."

32 W.Va. at 361–62, 9 S.E. at 244–45. The *Spring Garden* Court also explained that the

---

Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

corporation "had at the date of said deed a potential existence and it subsequently became an actual and legal corporation." *Id.* at 363, 9 S.E. at 245.

The issue of deed preparation prior to incorporation of the recipient was also tangentially addressed in *Clarksburg Electric Light Co. v. City of Clarksburg*, 47 W.Va. 739, 35 S.E. 994 (1900). In that case, this Court explained:

> I have no doubt that a deed for land made to a corporation named before incorporation, and so dated, but delivered after incorporation, would be good. The date of delivery and acceptance can be shown. It is never a deed until acceptance. *Guggenheimer v. Lockridge*, 39 W.Va. 457 (19 S.E. 874); 5 Thomp. Corp. § 5802. The latter authority says that "a deed of conveyance of land to an intended corporation before its organization will take effect upon the event of its organization; for its acceptance of the deed, when it becomes capable of accepting, will be presumed."

47 W.Va. at 750, 35 S.E. at 998.

This resolution is consistent with cases in other jurisdictions which have addressed this narrow issue. In *Community Credit Union Services, Inc. v. Federal Express Services Corp.*, 534 A.2d 331 (D.C.App.1987), for instance, the District of Columbia Court of Appeals explained that a property transfer between a debtor and a putative corporation was not effective until that corporation gained legal existence. 534 A.2d at 334. The same result was reached in *John Davis & Co. v. Cedar Glen No. Four, Inc.*, 75 Wash.2d 214, 450 P.2d 166 (1969). The Washington court reasoned as follows:

> Although it is true as a general rule that a deed is void if the named grantee is not a legal entity, the facts of this case fall within an exception to the rule.
>
> A deed to a corporation made prior to its organization, is valid between the parties. Title passes when the corporation is legally incorporated. This is particularly true as against one who does not hold superior title when the corporation goes into possession under the deed. 6 Thompson on

Real Property, § 3011 (1962); 2 Patton on Titles, § 337 (2nd ed. 1957).

450 P.2d at 170.

In *Bader Automotive & Industrial Supply Co. Inc., v. Green*, 533 S.W.2d 695 (Mo.App. 1976), the parties had entered into an employment agreement, including a covenant not to compete, prior to the incorporation of the plaintiff's business. 533 S.W.2d at 696–97. The defendant attempted to avoid the terms of the agreement by contending that the corporation could not ratify a contract that had been executed before the date of incorporation. *Id.* at 699. The *Bader* court responded, "It is a well settled principle that '[w]here one contracts with a body assuming to act as a corporation or by a name distinctly implying a corporate existence, both parties in a suit upon the contract are usually estopped from denying such corporate existence.'" *Id.* (quoting *Schneider v. Best Truck Lines, Inc.*, 472 S.W.2d 655, 659 (Mo. App.1971)). Similarly, in *P.D. 2000, L.L.C. v. First Financial Planners, Inc.*, 998 S.W.2d 108 (Mo.App.1999), the Missouri appellate court held that a contract executed before the formation of the L.L.C. became the L.L.C.'s contract when adopted by the L.L.C. after its formation. 998 S.W.2d at 110–111. The *P.D.2000* court held that the contracting party, knowing the L.L.C. was in the formation process, was "estopped to deny the existence of P.D. 2000" and could not withdraw from the contract before the L.L.C. had formed. *Id.* at 111.

In *Allen v. Scott, Hewitt and Mize, L.L.C.*, 186 S.W.3d 782, 2006 WL 88658 (Mo.App. 2006), a case remarkably similar to the present case, the Allens sold land to Thomas C. Scott, who was in the process of forming a limited liability company, to be identified as Scott, Hewitt and Mize, L.L.C. At closing, the Allens deeded the property to Scott, Hewitt and Mize, L.L.C., despite the fact that the certification of organization had not yet been issued to formally organize the company. The Allens later sued to rescind the contract. Summary judgment was granted to Scott, Hewitt and Mize. The appellate court affirmed, reasoning as follows:

> We consider first the Allens' argument on appeal that the sale and conveyance

should be rescinded because Scott, Hewitt and Mize did not exist until nine days after closing. Even assuming all facts in favor of the Allens, it is wholly irrelevant that Scott, Hewitt and Mize was not organized at the time that the Allens contracted with Scott. The Allens contract was with Scott. It is of no consequence to the Allens that Scott assigned his interest to an entity that, because of a defect in its organizational paperwork, had not finished the organizational process. The formation issues of Scott, Hewitt and Mize are irrelevant to the Allens' contract with Scott.

2006 WL 88658 at *1.

Even if this were not the case, Scott, Hewitt and Mize was capable of receiving a valid conveyance despite its not having complete [sic] the organizational process. Generally, to be valid, a conveyance requires a grantee in *esse* capable of taking and holding title to property when the conveyance occurs. *Allmon v. Gatschet*, 437 S.W.2d 70, 74 (Mo.1969). However, "equitable rights may result in favor of a subsequently formed corporation named as a grantee." *Id.* (citing *White Oak Grove Benevolent Society v. Murray*, 145 Mo. 622, 47 S.W. 501 (1898)). The Allens cannot challenge the transfer on the basis that Scott, Hewitt and Mize was not yet a *de jure* entity.

*Id.*; *see also Framingham Sav. Bank v. Szabo*, 617 F.2d 897 (1st Cir.1980); *Petroff v. Arbona*, 336 So.2d 178 (Ala.1976); *CMG Realty of Connecticut, Inc. v. Colonnade One at Old Greenwich Ltd. Partn.*, 36 Conn.App. 653, 653 A.2d 207 (1995); *American Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335 (Del.Ch.2003); *Source Direct, Inc. v. Mantell*, 19 Kan.App.2d 399, 870 P.2d 686 (1994); *Katz v. Prete*, 459 A.2d 81 (R.I.1983).

■ Based upon the foregoing authority, this Court holds that a deed drawn and executed in anticipation of the creation of the grantee as a corporation, limited liability company, or other legal entity entitled to hold real property is not invalidated because the grantee entity had not been established as required by law at the time of such execution, if the entity is in fact created thereafter in compliance with the requirements of law

and the executed deed is properly delivered to the entity, the grantee, after its creation.

Thus, in the case sub judice, we conclude that the lower court erred in holding that the deed was invalid simply because Heartland did not exist on the date the deed was signed. The Appellants specifically aver that all parties were aware of the status of Heartland and that Heartland would formally assume ownership of the property when the Articles of Organization were filed and the legal existence of Heartland was finalized. Thus, according to the assertions of the Appellants, there was no misrepresentation or subterfuge in the procurement of the deed. In that regard, the events and alleged agreements of the dry closing merit examination within this opinion.

### B. Dry Closing

■ Based upon this Court's review of the record and the deposition testimony concerning the events occurring at the dry closing, it appears that all individuals agreed at the dry closing that the roof would have to be repaired prior to completion of the sale. Thus, the repair of the roof appears to have been one of the conditions precedent to completion of the sale. The significant factual disagreements, however, focus upon the degree to which the representative of the Appellee, Mr. McIntosh, realized that Heartland had not yet been formally organized and that Heartland would consist of Hickory Plains, L.L.C., Dr. Siegel, and Ms. Sears. In the view of this Court, these factual discrepancies regarding the representations of the Appellants constitute genuine issues of material fact necessitating jury resolution of this matter and precluding summary judgment.

Examples of such factual discrepancies are rampant throughout the record. For example, despite Mr. McIntosh's assertion that he had no understanding of the formative stages of Heartland as of the date of the dry closing, the attorney for the parties, Mr. Howard, testified that during the two-hour dry closing meeting, he explained to all parties that Hickory Plains, L.L.C., was being substituted for Mr. Sharp as a member of Heartland. Mr. Howard further testified that Mr. McIntosh, as representative of the Appellee, appeared to fully comprehend the discussions,

seemed to have "lucid conversation," and did not raise any questions or objections to what was transpiring. Dr. Siegel testified that Mr. Howard discussed the formation of Heartland and attended to the signing of the Articles of Organization for Heartland. Dr. Siegel also testified that "everybody that was in that room was very clear that the—that Heartland, L.L.C., was being formed and that we were signing all the documents on that day, and I'm absolutely—I mean I would be totally shocked if Mr. McIntosh didn't understand that."

Ms. Sears testified that Mr. McIntosh was "very aware we were forming it [Heartland] that day, because we had discussions about it. We all sat around the table and did everything sort of together." Mr. Cohen, the representative of Hickory Plains, L.L.C., testified that it appears that everyone was aware that Heartland's papers were to be signed and thereafter filed. Ms. Stern, daughter of Mr. McIntosh, testified that she had driven her father to the dry closing because he had been on pain medication due to a broken leg sustained when he fell from a tree.

Mr. McIntosh[9] testified that he understood that the stable's roof needed to be repaired before all matters could be finalized. He also understood that Dr. Siegel, Ms. Sears, and Mr. Sharp were members of Heartland. Although he could not recall the attorney explaining the balloon note and the deed, he insisted that he understood what was occurring at the dry closing. He explained as follows:

[I] subsequently found out that Heartland did not exist and that gave me pause to wonder just who I was dealing with. I was given the impression at the dry closing that this was just another corporation. I mean like, for instance, you might say that you're buying a car that was made by General Motors. Well, how many times would you think to go back and legally check to see if General Motors was a legal corporation that could sell you a car.

In light of the foregoing factual issues, as evidenced by the varying explanations concerning the events of the dry closing, this Court concludes that summary judgment was improperly granted in this case. In determining whether a genuine issue of material fact exists, facts must be construed in the light most favorable to the Appellants, against whom summary judgment was granted. The record reveals genuine issues of material fact regarding the agreement for delay in the completion of the sale, pending repair of the roof and formation of Heartland. If indeed those conditions were adequately discussed and decided at the dry closing, a determination to be properly made by a jury, there exits no legal impediment to the consummation of such an agreement to delay completion of the sale until certain conditions were met. The genuine issues of material fact regarding the arrangements agreed upon during the dry closing must be evaluated by a jury.[10] This Court is not adjudicating the issues surrounding the dry closing; it is only ruling that the factual issues deserve evaluation by a jury.

## C. Alleged Violation of Statute of Frauds

██ The Appellee also asserts that summary judgment was appropriate because "any attempted assignment of the initial sales contract was not in writing; thus, the Statute of Frauds was violated." The Appellee's contention is based upon the fact that the written purchase agreement contemplated that the property would be purchased by Dr. Siegel, Ms. Sears, and Mr. Sharp. The deed contained the grantee name of Heartland. At the time the deed was signed, the

9. Mr. McIntosh was 74 years of age at the time of his deposition in July 2004. The record reveals that although he was handling his own business affairs for McIntosh Racing Stable, L.L.C., at the time of the dry closing, his son thereafter assumed some responsibility for the business affairs of the limited liability company.

10. This Court acknowledges the contentions of the Appellee that the Appellants should be foreclosed from raising the issue of any "oral con-

tract" on appeal since the Appellants did not address the oral contract issue in the court below. However, the record reflects that the Appellants expressly requested relief below, in the form of specific performance of the terms of the oral modifications of the sale agreement, as contemplated at the dry closing. Thus, we find no merit to the Appellee's contention that the concept of an "oral contract" is presented for the first time on appeal.

membership of Heartland had been changed to Dr. Siegel, Ms. Sears, and Hickory Plains, L.L.C. The Appellee, who denies knowledge of the changes, asserts that the Statute of Frauds is violated, and this Court must now determine if there is sufficient memorialization in a written document to allow this issue to be considered by a jury.

As this Court has previously recognized, the underlying purpose of the statute of frauds is "to prevent the fraudulent enforcement of unmade contracts, not the legitimate enforcement of contracts that were in fact made." *Timberlake v. Heflin*, 180 W.Va. 644, 648, 379 S.E.2d 149, 153 (1989) (citation omitted).[11] The following observations were included in Richard A. Lord, 10 Williston on Contracts § 29.4 at 437–38 (footnotes omitted):

> The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made. In brief, the Statute "was intended to guard against the perils of perjury and error in the spoken word." Therefore, if after a consideration of the surrounding circumstances, the pertinent facts and all the evidence in a particular case, the court concludes that enforcement of the agreement will not subject the defendant to fraudulent claims, the purpose of the Statute will best be served by holding the note or memorandum sufficient even though it is ambiguous or incomplete.

As was succinctly explained in *Wemhoff v. Investors Management Corporation of America*, 528 A.2d 1205 (D.C.App.1987), "[T]he statute [of frauds] ... does *not* require an exhaustive, integrated statement of the agreement in writing, but only a sufficient statement to establish that there in fact *was* an agreement and that the party charged should be bound by it." 528 A.2d at 1207 (quoting *Hackney v. Morelite Constr.*, 418 A.2d 1062, 1065 n. 1 (D.C.1980)). In *Cunningham v. Lester*, 138 S.W.3d 877 (Tenn.Ct.App.2003), the court explained as follows: "[T]o be enforceable under the statute of frauds a signed writing must express the essential terms of the agreement with a degree of certainty such that the agreement of the parties can be determined without recourse to parol evidence." 138 S.W.3d at 880. In discussing the *Cunningham* case, the Court of Appeals of Tennessee in *In re Estate of Price*, 2005 WL 3159771 (Tenn.Ct. App.2005), recognized the following:

> The statute of frauds, however, may be satisfied by multiple writings if (1) the party to be charged signed at least one of them, (2) the court can determine from the face of the writings that they are related, and (3) the court can determine with certainty the essential terms of the contract without the use of parol evidence.

2005 WL 3159771 at *4.

It is particularly significant in the present case that Mr. Cohen, as representative of Hickory Plains, L.L.C., Dr. Siegel, and Ms. Sears, signed the Balloon Note at the dry closing as the three members of borrower Heartland. Although that note was not signed by Mr. McIntosh, it identified the

---

11. In syllabus point two of *Timberlake*, this Court held that "[a] pleading in a civil case may satisfy the requirement of a memorandum under W.Va. Code § 36–1–3." This Court also explained in *Timberlake* that "[w]e recognize, as have other courts, that a pleading may, in appropriate circumstances, be sufficient to take a parol contract out of the statute of frauds. In a related line of cases, representative of the modern trend, courts have crafted a 'judicial admission' exception to the statute of frauds." *Id.* at 647, 379 S.E.2d at 152 (footnote and citations omitted). The Appellants direct this Court's attention to the following statement of the Appellee, included in its December 30, 2004, Pretrial Statement:

> [At the April 4, 2003, closing,] it was announced that purchaser Sharp was not interested in consummating the [Purchase Agreement for Land], nor was he interested in being a member of Heartland, L.L.C. Instead, Purchaser Sharp announced at the closing table that his interest in the arrangement would be assumed by another business entity, Hickory Plains, L.L.C. Randy Cohen is the manager of Hickory Plains, L.L.C. No assignment was ever reduced to writing.

While we acknowledge the Appellants' argument that such statement constitutes a judicial admission, we do not find it dispositive of this issue due to the existence of multiple documents memorializing this sale.

lender as McIntosh Racing Stables, L.L.C. Significantly, that document specified that the borrowers were "fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed."[12] The document continued:

Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of the guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder [the Appellee] may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

Mr. McIntosh personally signed written documents providing evidence of the sale to Heartland. First, the deed granting the property to Heartland was in writing and signed by Mr. McIntosh. Second, the Informed Consent form was also in writing and signed by Mr. McIntosh. It permitted Mr. Howard to represent both sides of the sale and specifically identified Heartland as the borrower and the Appellee as the seller. Third, the written Settlement Statement was signed by Mr. McIntosh, identifying the borrower as Heartland, describing the property being sold, and summarizing the financial components of the transaction. Fourth, Mr. McIntosh signed the Owner's Affidavit regarding the possession of the subject real estate and other conditions concerning taxes, liens, leases, or judgments affecting the property for purposes of title certifications.

Thus, due to fact that the substitution in this transaction was memorialized by several written documents signed at the dry closing, this Court finds no merit in the Appellee's assertion that there has been a violation of the Statute of Frauds meriting a grant of summary judgment for the Appellee. Furthermore, the grantee in the subject written deed was Heartland as a legal entity. In this opinion, we have held that the deed is not invalidated by the fact that Heartland had not filed its Articles of Organization by the time the deed was signed. In this Statute of Frauds claim, it is essentially the evolution of the recipient grantee from three individuals, as contemplated in the written purchase agreement, to Heartland as a legal entity composed of three members that the Appellee is challenging. Based upon the extensive written documentation, the deed itself, and the absence of any evidence of fraud or duress, we find sufficient memorialization to permit these issues to go to a jury. We therefore reverse this matter for further development.

### D. Reasonable Time for Completion of Sale

The lower court also found that the Appellants engaged in unreasonable delay in filing the Articles of Organization to form Heartland and in attempting to complete this sale of the stable. Indeed, it is generally held that when a condition to be performed is not limited by an agreement, the condition must be performed or abandoned within a reasonable time. *See* Syl. Pt. 2, *E. Shepherdstown Developers, Inc. v. J. Russell Fritts, Inc.*, 183 W.Va. 691, 398 S.E.2d 517 (1990). However, in the present case, there is no evidence that the parties agreed that any condition precedent had to be performed by a certain date, and thus the reasonableness of any delay should be resolved by a jury. *See, e.g., Howell v. Appalachian Energy, Inc.*, 205 W.Va. 508, 517, 519 S.E.2d 423, 432 (1999) ("What constitutes a 'reasonable period of time' is normally a question of fact"); *Stone v. United Engineering*, 197 W.Va. 347, 360, 475 S.E.2d 439, 452 (1996) ("The question of whether the vendee

---

12. This clause substantiates the right of the Appellee to seek payment from the signers, individually, and indicates that these promoters of the limited liability company to be formed were personally liable under this contract. *See King Features Syndicate, Dept. of Hearst Corp. Intern. News Serv. Div. v. Courrier*, 241 Iowa 870, 43 N.W.2d 718 (Iowa 1950) (holding that promoters of corporation are personally liable on contracts they entered into personally, despite fact that they have contracted for benefit of projected corporation; promoters are not subsequently discharged from liability by adoption of contract by corporation when formed, unless there is agreement to such effect).

had a reasonable time to cure the defect or dangerous condition is a question of fact and is therefore for the jury").

In the present case, the determination of the reasonableness of the delay in finalizing this sale is a question of fact and must be made by a jury. Thus, the lower court improperly granted summary judgment on that issue.

## IV. Conclusion

Based upon the foregoing evaluation, this Court reverses the lower court's order granting summary judgment to the Appellee and remands this matter for further proceedings. Genuine issues of material fact exist surrounding the agreement for the sale of this property and the Appellee's attempt to rescind the agreement. Thus, summary judgment was inappropriate.

Reversed and Remanded.